**BLAKE CONSTRUCTION COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 556–85C.**

United States Claims Court.

Jan. 27, 1992.

Richard D. Corona, San Diego, Cal., for plaintiff.

C. William Lengacher, Washington, D.C., with whom were Thomas W. Petersen, Asst. Director, David M. Cohen, Director, Commercial Litigation Branch, and Stuart M. Gerson, Asst. Atty. Gen., Civ. Div., for defendant. Frank Kitarski, Dept. of the Navy, San Diego, Cal., of counsel.

## OPINION

SMITH, Chief Judge.

This case involves a claim arising out of a subcontract to a fixed-price contract between Blake Construction Company, Inc. (Blake) and the United States Department of the Navy, Naval Facility Engineering Command, for the construction of a hospital addition to the Naval Regional Medical Center in San Diego, California. The claim is brought under the contract's disputes clause by the prime contractor on behalf of the electrical subcontractor. The contract has been performed, the project has been completed, and plaintiff now seeks an equitable adjustment on its claim under the contract's changes clause, following a denial by the contracting officer (CO). Since the trial, the government has filed a motion to dismiss, claiming that the plaintiff did not submit its claim to the CO, as 41 U.S.C. § 605(a) (1988) requires.

In light of the evidence presented at trial, and in consideration of the parties' stipulations and post-trial submissions, the court finds that plaintiff is entitled to recover on its entire claim under the Contract

Disputes Act of 1978 (now codified at 41 U.S.C. §§ 601–611 (1988)). The court further denies the government's motion to dismiss and plaintiff's motion for sanctions relating to the government's motion. Sanctions are not warranted in this case.

### FACTS

On June 15, 1983, Blake Construction Company, Inc. (Blake), as prime contractor, entered into a $98.4 million contract with the Navy. In furtherance of its contract with the Navy, Blake entered into a subcontract on July 25, 1983 with Steiny and Company, Inc. (Steiny)[1] to perform all electrical work on the addition for a total contract price of $10.2 million. Part of the electrical work involved the installation of an electrical feeder system, the subject of this litigation. An electrical feeder system is made up of the main power lines which distribute electrical energy to the hospital via a network of ever smaller lines that spread like tree branches through the hospital complex. In a large complex like this one there are also transformer units that reduce the high voltage lines coming into the hospital into various lower voltage ones for the ultimate hospital uses.

The design and contract drawings and the specifications for the hospital addition were prepared by a joint venture architect and engineering firm (A & E firm) hired by defendant. The joint venture consisted of Welton Becket & Associates, Hugh Gibbs & Donald Gibbs Architects, A.I.A., and Syska & Hennessy, Inc. The A & E firm produced thirteen books containing many hundreds of contract drawings and three volumes of contract specifications, all of which were provided to contractors interested in bidding on the construction project.

The project involved the construction of four buildings on a rectangular tract measuring approximately 1,200 feet by 200 feet. All floors of these buildings, including the ground floors, were to be built above grade. The four structures are:

(1) the central plant, which serves as the medical center's heat and power station and contains heavy equipment and machinery to provide mechanical and utility services such as steam, heat, power, air and water;

(2) the warehouse, a one-story structure with fourteen foot high ceilings, where the medical center's supplies are located;

(3) the auxiliary building, the largest of the four structures, which contains up to six levels of administrative offices, waiting rooms, examination rooms, doctor offices, operating rooms, a pharmacy, laboratories, a cafeteria, record storage, and kitchen and laundry facilities; and

(4) the nursing tower, a six-story building consisting of hospital rooms surrounding a core containing patient monitoring equipment.

Incorporated into the A & E firm's design was a material and personnel corridor which runs most of the length of the ground floors of the four new buildings and connects the central plant at the southern end of the project to the nursing tower at the northern end as well as to the structures between. The corridor measures approximately 14 feet high by 18 feet wide, and is intended to facilitate the movement of people, supplies, and utilities within the hospital addition. Defendant represents that the corridor also is intended to house the electrical feeder system, a contention plaintiff disputes.

On or about December 13, 1983, Steiny excavated a trench eight feet deep near the path of the planned corridor, and began to install the electrical feeder in polyvinyl chloride (PVC) conduit in an underground concrete encased duct bank. When Navy personnel questioned Steiny about the trench and use of PVC conduit on December 13, 1983, Steiny's representative replied that it was installing the feeder system underground to avoid interference with other trades, as required by the contract. Because it believed the contract permitted this work, Steiny had not requested a change order or other authorization from the Navy. Two days later, the Navy gave written notice to Steiny that the Navy did

1. Blake brings this claim on behalf of Steiny, the real party in interest in this action.

not consider an underground installation to be included in the contract, and directed that the duct bank be removed and the feeder system be installed within the confines of the corridor.

Blake gave timely notice to the Navy that it considered the Navy's directive of December 15, 1983 to be a constructive change, and requested additional compensation. The Navy rejected this request. Steiny removed the underground duct bank under protest.

Thereafter, Steiny was directed by the Navy through Blake to install its conduit system precisely at the locations shown diagrammatically on the electrical drawings. On January 13, 1984, the mechanical subcontractor advised plaintiff that such an installation, however, required Steiny to install its conduits at the exact same location on the west side of the corridor where the amended mechanical drawings showed the installation of plumbing lines. This situation would prevail for 300 to 400 feet. Blake notified the Navy of this conflict, and was advised that it was the prime contractor's responsibility to coordinate and resolve subcontractor problems of this nature. The Navy continued to insist that Steiny's installations rest on the utility racks precisely as shown diagrammatically on the electrical drawings, and that the conduits at all times remain within the corridor.

Pursuant to these instructions, Blake, Steiny, and the mechanical subcontractor undertook an exhaustive engineering, layout, and coordination effort to ascertain the physical possibility of installing the plumbing and electrical utilities in the conflicting and confined spaces directed. As a result of this effort, it was determined that complete compliance with defendant's directives was impossible. Thus, it would be necessary in some areas to route the conduit outside the corridor and in another area to forego the use of conduit at all and install bare cable on cable trays. This was not an ideal solution. Presented with this information, the Navy retained, under a new contract, the design engineers for the hospital addition, to prepare design drawings to verify Blake's and Steiny's conclusion. The result of the A & E's study was that the electrical conduit system could not be installed completely in the manner and locations shown on the electrical drawings. In light of the A & E's conclusion, defendant ordered Blake to proceed with the revised installation, which was done.

At the conclusion of its work, Steiny had installed most of the electrical feeder system within the confines of the corridor on brackets attached to the ceiling near the corridor's east wall. The conduit was placed either exposed (in the warehouse) or concealed above a drop ceiling (in the run through the auxiliary building to the nursing tower). In some places it was necessary to intricately weave the conduit around mechanical conduits or pipes in order to remain within the confines of the corridor. In a roughly thirty foot section near one of the substations and a segment in the boiler room the routing resulted in the conduit being outside the corridor.

On October 12, 1984 Blake certified and submitted a claim on behalf of Steiny to the CO, in accordance with the Contract Disputes Act, and pursuant to the disputes clause of the contract. The amount claimed, $3,493,967.00, was based on a forward-priced estimate of the direct, indirect, and consequential costs and damages expected to be incurred. After the disputed work was performed, and by letter dated January 4, 1988, Blake submitted to Captain William J. O'Donnell, the Officer in Charge of Construction (OICC), a revised computation of its extra costs incurred in the sum of $1,136,089.00. That revised calculation was submitted by Blake to the CO by letter dated March 8, 1988.

## DISCUSSION

The court has heard argument on whether the specifications governing the electrical feeder system were of a design or performance nature, and on the meaning of the phrase "diagrammatic" on the contract drawings. The court visited the site and observed the installation as it ultimately was constructed. The court, with the assistance of counsel and the witnesses

presented, has studied the drawings and specifications governing this project. After carefully considering all of the material offered in this case, the court is convinced that this dispute arises not out of any genuine factual difference between plaintiff and the Department of the Navy, but out of the unwillingness of the Navy to reconsider a hastily-made decision, and the subsequent efforts to substantiate an arbitrary order.

At the outset, the court notes that Captain William J. O'Donnell, who made the decision and gave the order, was responsible for completing a large and generally very successful project on time and within budget, and for that he must be commended. In light of the magnitude of the overall project, it is a credit to Captain O'Donnell, his leadership, and his staff that relatively few disputes developed. Nevertheless, there is no doubt that Captain O'Donnell's decision to order Steiny to cease its construction of the underground duct bank and to install the feeder system overhead was arbitrary, made, as he admits, without first discussing the issue with the contractor, the subcontractor, the A & E firm, or his own staff. In the court's view, it also cannot be supported as a correct or even a reasonable interpretation of the contract.

It is clear to the court that the issue which created this case was not one of the efficacy of Steiny in dealing with and performing its contractual duties. These duties were fulfilled very competently. Captain O'Donnell's own testimony attests to the fact that it was a "good job ... [completed] a little ahead of schedule." When he informs the court that we are here on the basis of a unilateral decision made without benefit of consultation which he will never reconsider "till the day [he dies]," the true nature of this case is clear.

### I. Motion to Dismiss

Approximately six months after trial, the government filed a motion to dismiss, claiming that plaintiff had not submitted its certified claim to the contracting officer. Plaintiff had submitted its claim to the OICC, Captain O'Donnell, and not the Commander, Naval Facilities Engineering Command, as the government contends it should have done. In support of its contention, the government cites *West Coast General Corp. v. United States*, 19 Cl.Ct. 98 (1989), for the proposition that the contractor cannot submit its claim to the Officer in Charge of Construction (OICC) and comply with 41 U.S.C. § 605(a), which requires that claims be submitted to the "contracting officer."

However, after the government's motion to dismiss was filed, the Court of Appeals for the Federal Circuit ruled on the issue of submission of claims to the CO. In *Dawco Construction, Inc. v. United States*, 930 F.2d 872, 879-80 (Fed.Cir.1991), the Federal Circuit recognized that "Congress deliberately left the language concerning submission [of claims] to the contracting officer broad to permit appropriate Government officers to receive written claims and forward them to the contracting officer," (citing with approval *American Pacific Roofing Co. v. United States*, 21 Cl.Ct. 265, 268 (1990), in which the court found a claim submitted to the OICC to satisfy § 605(a)). The Federal Circuit noted that "the purpose of the [Contract Disputes] Act's 'submit' language is not related to the minutia of addressing or delivering claim letters ... but is merely a requirement that once a claim is made, the parties must 'commit' the claim to the contracting officer and 'yield' to his authority to make a final decision." *Dawco Constr., Inc.* at 880. It is thus clear to this court that Blake's submission of Steiny's claim to the OICC did not preclude a full hearing of that claim. *See also Neal & Co. v. United States*, 945 F.2d 385 (Fed.Cir.1991) (affirming that a claim submitted to the contractor's primary government contact rather than directly to the contracting officer satisfies § 605(a)). Accordingly, the government's motion to dismiss for failure to submit a claim properly is denied. Plaintiff's motion for sanctions against the government is also denied as the government filed its motion to dismiss prior to the Federal Circuit's decision on this issue.

### II. Liability

#### A. *The Nature of the Specifications*

Notwithstanding the legal arguments proffered, the resolution of this dis-

pute does not require an extensive discussion of the law.[2] Defendant correctly points out that when a contractor agrees to do for a fixed sum a thing possible to be performed, it will not be entitled to additional compensation because difficulties are encountered. *United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918). Thus, the critical question facing the court is what the contract required of the contractor, or, more specifically, whether the contract permitted the contractor to construct an underground duct bank. Resolution of this issue will determine whether the Navy's order to stop work on the underground construction and install the conduit overhead constituted a constructive change for which Steiny should be compensated.

Plaintiff urges that the specifications concerning the placement of the electrical conduits are performance specifications which by definition prescribe the desired result but leave the manner by which it is to be achieved up to the contractor. Alternatively, plaintiff argues that regardless of the characterization of the specifications, the contract required the electrical contractor to relocate the conduits to avoid interference with other trades, and provided no limitation on the scope of the relocation.

Defendant contends that the specifications in question were design specifications, and that pursuant to the specifications plaintiff was bound to install the electrical conduit above the utility corridor as depicted on the contract drawings. In defendant's view, therefore, it is immaterial whether an underground duct bank would have provided a *better* installation. In regard to plaintiff's alternative argument, defendant argues that the provisions in the specifications and on the drawings instructing the electrical contractor to relocate to avoid conflicting with other trades contained the pictorial limitation that any relocation be within the corridor. Defendant makes this argument even while admitting there were no words of limitation in the specifications or on the drawings. Defendant thus rests its argument on the assertion that plaintiff's interpretation would render certain provisions of the contract meaningless, most particularly the feeder detail drawings, and therefore plaintiff's version of the contract should be disregarded. Defendant maintains that a correct reading of the contract evidences the designer's intention that the electrical conduit be installed overhead.

The Federal Circuit has stated that "[d]esign specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results." *Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1582 (Fed.Cir.1987). Thus, the crucial issue before the court is whether the specifications in question "set forth an objective or standard to be achieved," or whether they "set forth in precise detail the ... manner in which the work was to be performed." *J.L. Simmons Co. v. United States,* 188 Ct.Cl. 684, 412 F.2d 1360, 1362 (1969) (defining performance and design specifications, respectively).

As is often the case, the contract governing this project contained both performance and design specifications, as well as mixed specifications. The specifications directing the electrical subcontractor's performance also contained both design and performance elements. For example, there is no dispute that the specifications and drawings indicating location of the substations were design specifications. The drawings were very specific in describing the locations of the substations relative to one another and relative to the structures in which they were located. The contractor could not have taken it upon itself to move the substations from the west to east side of the building, notwithstanding any contractual provision mandating the avoidance

---

**2.** Defendant argues several canons of contract interpretation, all of which are available to assist the court only if the contract is not clear on its face. Because the court finds that the contract clearly permitted the contractor to perform the work in the manner the contractor attempted, the court need not consider the merits of those arguments.

of conflict with other trades. This was the definitive testimony of witnesses from both sides, and is based on the critical nature of the placement of the substations.

Based upon both parties' experts and the way the drawings were used, it was equally clear that the specifications and drawings for the electrical conduits were performance specifications. Unlike the substations, it is of little consequence where the exact location of the electrical conduits are in an installation such as this hospital addition. To the extent that there is a preference for either an overhead location or an underground location, the convincing testimony strongly indicated that an underground duct bank would be highly preferable here. It is also preferable according to the best industry practice. Although defendant is correct that the drawings depicted the conduits as suspended from brackets above the corridor, notations on the drawings also indicated that they were "diagrammatic only" and obligated the electrical subcontractor to relocate to coordinate and avoid interference with other trades. The drawings in question are reproduced below:

Diagrammatic representation of the cross sections of the utility corridor that appeared in the Navy's drawing E4.47, which is plaintiff's exhibit 1.4.

Notes at bottom of E4.47.

---

The notations on the drawings, similar provisions in the specifications, and the practice of the electrical industry indicate that the method of installation of the elec-

trical feeder systems was governed by performance specifications. At a minimum, it would be inconsistent with the mandate that the electrical subcontractor give way to other trades to construe that the specifications "set forth in precise detail the ... manner in which the work was to be performed." *J.L. Simmons Co.*, 412 F.2d at 1362. It is thus this court's determination that the specifications at issue are performance specifications.

### B. The Placement of the Electrical Feeder System

Having determined that the specifications are performance specifications, the court must determine whether plaintiff's decision to place the electrical feeder system in an underground duct bank was based upon a reasonable interpretation of those specifications. If it was, it is compensable. After weighing the evidence, the court finds Steiny's placement decision not only consistent with a reasonable reading of the contract and its requirements, but also the best one that could have been made. In making this determination, the court also finds defendant's insistence that the electrical feeder system be placed overhead contrary to the contract's terms and without a rational basis. No credible reason has been put forth by defendant to buttress its bald assertion that the electrical feeder system should not have been placed underground. Defendant's argument that the specifications were design rather than performance specifications seems to be based on the misunderstanding that a diagram is also some kind of picture of the final result. The result of this is that the government got an inferior job at a much greater cost! While the court recognizes that the government has the prerogative to contractually require that an objectively unreasonable approach be taken by a contractor, the government does not possess the power to compel a contractor to take such an approach *without compensation* where the contractor never agreed to that bargain.

The reasonableness of plaintiff's placement decision and its consistency with the specifications is also borne out by considerations of safety, feasibility, and cost.

#### 1. Safety

From the standpoint of safety, the evidence was convincing that the electrical feeder system posed far less risks placed underground. On its site visit of the hospital, the court observed the morass of wires and conduits which adorned the ceiling of the corridor. A sample of these is shown below.

A section of the utility corridor with ceiling panels removed.

Cable tray with bare cable resting on it.

This presented an unnecessary installation challenge as well as a maintenance problem. In the event of maintenance on the electrical or other utility conduits, it presents a safety hazard. In fact, on its site visit to the warehouse the court observed damage to the high voltage conduits and a large junction box above the corridor, at least in part as the result of forklift use. There was a forklift parked in the area beyond the line marked "no forklifts beyond this point." The very kind of activity that could and has caused overhead electrical conduit damage was thus observed. Expert testimony indicated that if the conduit and cable were broken by such a collision serious consequences could occur. Underground conduits would be immune from this problem. The possibility for future damage to the electrical feeder system was also readily apparent from this visit. The conduits which enclosed the electrical system were in many places packed closely to steam and water pipes, which pose significant problems for future maintenance or expansion. It was thus plain that much of the safety concerns created by the corridor placement could have been alleviated by placing as much of the wiring and conduits as possible underground.

### 2. Feasibility

It is also clear to the court that practical considerations dictated the placement of the electrical feeder system underground. As the parties acknowledge, the feeder system was extremely complicated, consisting of hundreds of wires and other electrical materials. As such, the feeder system created a crowding problem when placed overhead. The evidence again showed that it was not only wise to put the system in an underground duct bank below the corridor surface, safe from harm's way, it was also the only feasible solution available to Steiny given the spatial constraints of the corridor. It was also clear on the court's visit that there was major interference between the electrical feeder system and the other trade materials in the hospital corridor. In this respect, too, practical consider-

ations dictated the placement of the system in an underground duct. According to the defendant's own representation, accessibility to the system for maintenance and repair was an important concern of the Navy. However, Mr. McClure testified and the evidence indicates that the feeder system would have been more accessible had it been placed in an underground duct.

### 3. Cost

Finally, in terms of cost, plaintiff's placement decision was superior. In regard to the initial installation of the feeder system, the evidence illustrates a considerable cost difference between utilizing overhead brackets and an underground duct. The physical layout of the hospital corridor required routing the conduits around other trade materials. By contrast, placing the feeder system underground presented a far more cost effective alternative of simply digging a trench and placing the system in it. The only concern in placing an electrical system underground involved potential interference with the foundation, a concern the evidence indicated, was not present here.

The cost differential between the two methods of installation over the course of time also militated against a rational decision requiring the feeder system overhead. Once the electrical system is put in place, maintenance costs are continuously incurred. The evidence showed that the underground duct would have provided easier, and therefore more cost-effective, access to the conduits. Repair and maintenance of the conduits in their present bracket positions involves potential interference with and possible damage to the other systems and conduits. It also involves potential interference with people and materials moving through the corridor. Additionally, it increases the very likelihood of any maintenance.

### III. Damages

■ At trial, plaintiff offered very convincing evidence in regard to the damages

it is entitled to as a result of the Navy's constructive change. Supplemented by the credible testimony of Mr. Don McClure, plaintiff presented an itemization of the costs incurred as a result of requiring the conduit to be placed overhead rather than underground. The costs were broken down as follows:

| | |
|---|---:|
| Direct costs | $854,125.00[3] |
| Field overhead | 187,908.00 |
| Steiny divisional overhead | 92,845.00 |
| Steiny profit (20%) | 226,976.00 |
| Steiny bond | 8,035.00 |
| Blake overhead | 198,634.00 |
| Blake profit (6%) | 94,111.00 |
| Blake bond | 16,626.00 |
| Total costs | $1,679,260.00 |

The government attempted to counter plaintiff's damage claim with the testimony of Mr. Ray Caswell. Mr. Caswell chal- lenged the validity of the direct cost fig- ures upon which plaintiff based its calcula- tions. Specifically, Mr. Caswell questioned plaintiff's proposed estimate for the unit cost of a representative cross section of the duct bank. The estimate figure represent- ed the total cost of one lineal foot of the duct pipes or conduits, a figure which when multiplied by the length of the corridor would produce a direct cost estimate. The duct bank consisted of various conduit sizes, *e.g.* one four-inch, two three-inch, five two and one-half inch, *etc.* Thus, within a given cross section of the duct bank, there were different numbers of various conduit sizes. Upon close examination by the court, it became obvious that Mr. Caswell had no basis for calling into question plain- tiff's damage calculations.[4]

3. This figure represents the revised amount of direct costs claimed by plaintiff, as corrected at trial. *See* McClure testimony, January 26, 1990, transcript pages 823–42. The damage figures which follow the direct cost figure are calculat- ed according to the methodology set forth in plaintiff's exhibit 64.1.

4. The court offers the following exchange be- tween the court and Mr. Caswell as representa- tive of the government's challenge to plaintiff's damage figures:

THE COURT: How do you factor in the fact that that's not a representative sample? How do you increase $16.83 to what, in fact, it would be if you had 3 at one-inch, 4 at four- inch, 2 at two-inch, etc. Where is that calcu- lation done?

MR. CASWELL: Well, I didn't quite under- stand what you are saying, Your Honor, about the $16.83.

THE COURT: Well, the $16.83 represents only one of each category of pipe, only one lineal foot of each category of pipe.

MR. CASWELL: Yes.

THE COURT: But in the real world, assuming your count as opposed to—there's been some dispute on that issue—but assuming your count, that there are 4 four-inches, and 3 one- inches, and 2 two-inches, how do you come to that fact? What figure increases the $16.83 which should only represent one of each type per foot?

MR. CASWELL: If you'll note in the column where it says prime there, the total of all of those unit measurements, that $1.04, $7.75, $2.00, and $6.00, and so on, you total that all up and it's $12.93 [sic] for that one cross section.

THE COURT: Right. Of one each. That's only assuming, not the real cross section, it's only one of each pipe because it's only got 1 one-inch, instead of 3. Its only got—that I can see.

MR. CASWELL: So, if you took 985 feet times that number, you should have a cross section of that total cost.

THE COURT: But you still have—you've only got accounted—because we're going through this step by step, you've only accounted for one of the one-inch instead of three of the one-inch. The $1.04, we agreed, was the labor and the material cost for 1 one-inch section. If it was to be really representative of the real cross section, it should be—that one should be $3.12. Shouldn't it?

MR. CASWELL: Yes, I see what you are say- ing, and that would be correct.

THE COURT: So, that would mean, in fact, the $16.83 would be substantially larger.

MR. CASWELL: The $16.83 represents the sum total of all of the markups on that one line of one foot.

THE COURT: Right. But, that's a non-repre- sentative line. It would be, I guess, to have the analogy, if we were going to try to deter- mine, to give a different value to each color of clothing, we would have, say, one blue jacket here and we have one tan jacket and we have one green person. That, obviously, wouldn't be a real reflection of anything other than just a listing of the different colors we have avail- able. If you wanted to have an actual portion of how many blue coats and how many tan coats, we'd have to count everyone in the universe.

MR. CASWELL: What I do, Your Honor, is when I get these numbers, I check them with other data on a cross section duct bank.

THE COURT: Yes.

MR. CASWELL: And get the cost, the general cost from history, from what it costs to run

## CONCLUSION

As a result of Captain O'Donnell's change to the contract, Steiny is entitled to a contract adjustment in the amount of One Million Six Hundred Seventy Nine Thousand, Two Hundred Sixty Dollars ($1,679,-260.00), together with interest thereon from October 12, 1984. Interest is to be computed according to the Contract Disputes Act, 41 U.S.C. § 611 (1988). The clerk is directed to enter judgment accordingly. Plaintiff will have sixty days from the issuance of this opinion to file, if it so elects, an application for attorney fees and expenses under the Equal Access to Justice Act. 28 U.S.C. § 2412(d)(1)(B) (Supp.1991).

IT IS SO ORDERED.

one foot of that. At the time that I had this number there, I was pretty satisfied that it was indicative of that bank because of other source material.

THE COURT: But even by your own figures on the left side, it isn't indicative of the mix, because the mix is not even proportionately of 3 one-inch, 4 four-inch, 2 two-inch, where your $16.83 seems to say you have one of each.

MR. CASWELL: That's what it seems to be indicating.

Caswell testimony, January 26, 1990, transcript pages 910–12.