**BLAKE CONSTRUCTION COMPANY, INC., Plaintiff–Appellee,**

v.

**The UNITED STATES, Defendant–Appellant.**

No. 92–5092.

United States Court of Appeals, Federal Circuit.

Feb. 23, 1993.

Rehearing Denied; Suggestion for Rehearing In Banc Declined April 13, 1993.

C. William Lengacher, Dept. of Justice, Washington, DC, argued, for defendant-appellant. With him on the brief were Stuart M. Gerson, David M. Cohen and Thomas W. Petersen.

Richard D. Corona of Corona, Balistreri & Ramseyer, San Diego, CA, argued, for plaintiff-appellee. Of counsel was C. Kevin Bond.

Before NIES, Chief Judge, RICH and MAYER, Circuit Judges.

MAYER, Circuit Judge.

The United States appeals the judgment of the United States Court of Federal Claims,* 25 Cl.Ct. 177 (1992), awarding an equitable adjustment to Blake Construction Company, on behalf of its subcontractor Steiny and Company, Inc., for additional costs incurred under its contract with the Department of the Navy. We reverse.

## BACKGROUND

Blake Construction Company contracted with the Department of the Navy to construct replacement medical facilities at the San Diego Naval Regional Medical Center. The contract called for the construction of four new structures, including a mechanical equipment building, a warehouse, an auxiliary building, and a nursing tower. A corridor of approximately 1,000 feet ran most of the length of the ground floors of the buildings and was designed to enable people, supplies and utilities to move between the buildings. It is the manner in which the contract required electrical con-

duits to be installed along this corridor as part of an electrical feeder system that gives rise to the controversy before us.

Specifications governing the installation of the electrical feeder system were prepared by a joint venture architect and engineering firm and were made available to bidders. Power coming into the hospital from outside high voltage lines was to be reduced to a variety of lower voltages by transformer units and then distributed throughout the buildings via a branching series of ever smaller lines conveyed by electrical conduits. The series of drawings pertaining to the installation of the electrical conduits within and between the buildings depicted the conduits as installed overhead along the west side of the corridor, hanging either exposed from utility racks, or hidden from view by a dropped ceiling. These drawings also included notes describing the drawings as "diagrammatic." On some drawings the notes stated: "All feeder details & sections are diagrammatic. Contractor shall relocate any/all conduits as per existing conditions to coordinate with all other trades." On other drawings the notes similarly stated: "All feeder locations are diagrammatic. Contractor shall relocate feeders as per existing conditions and shall coordinate with other trades."

After Blake was awarded the contract, and before any construction of the buildings had commenced, its electrical subcontractor Steiny and Company, Inc. began installation of the electrical feeder system in an underground concrete duct bank along the planned path of the corridor. When the Navy challenged this installation method, Steiny asserted that the contract's "diagrammatic" notes permitted the contractor to relocate the electrical conduits so as to avoid conflict with other trades, such as mechanical and plumbing, which were to be installed in the corridor. The Navy issued a stop work order informing Blake that the underground duct bank did not comply with the contract specifications, and directed that the conduits be installed over-

---

* The United States Claims Court was renamed the Court of Federal Claims on October 29, 1992. Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506 (1992).

head within the corridor as depicted in the drawings. Blake notified the Navy that it considered this directive to be a constructive change to the contract for which it was entitled to more money. When the Navy reissued its directive, Steiny removed the underground bank under protest.

After the corridor was constructed and ready to receive utilities, a conflict arose between Steiny and the mechanical subcontractor over the location of their respective trades. To alleviate the interference, Steiny agreed to move to the east side of the corridor. In one thirty foot section, the electrical conduits had to be placed outside the corridor, and in another they were located outside the planned route of the feeders. Both changes were approved by the Navy. In addition, Steiny generally had to weave the conduits between and around the other utilities in the corridor.

Blake submitted a claim on behalf of Steiny for an equitable adjustment to cover the costs of relocating the underground duct bank to the overhead placement. The contracting officer denied Blake's claim and this action in the Claims Court followed. After a trial, the Claims Court held that Blake was entitled to recover $1,679,- 260 plus interest, representing the cost incurred pursuant to the Navy's directive to install the conduits overhead in the congested corridor. The government appeals.

## DISCUSSION

The central question in this case is whether the contract gave Blake discretion to choose an underground location for installing the electrical feeder system. The point of disagreement is the meaning of the notes indicating that the drawings were "diagrammatic" and requiring the contractor to relocate in order to coordinate with other trades. The word "diagrammatic" is not defined by the contract.

Blake urges that resolution of this case turns on the characterization of the specifications as either "design" or "performance." The difference between performance specifications and design specifications is well established. Performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." *J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 412 F.2d 1360, 1362 (Ct.Cl.1969). Design specifications, on the other hand, describe in precise detail the materials to be employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the specifications, but is "required to follow them as one would a road map." *Id.* "Detailed design specifications contain an implied warranty that if they are followed, an acceptable result will be produced." *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed.Cir.1987) (citing *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918)).

Blake argues that the specifications in question are performance specifications which describe one objective—that the electrical feeder system be installed in a manner which avoids conflict with the other trades. It offers these arguments in support of its contention. First, because the diagrammatic notes explicitly required Blake to avoid interference with the other trades, without detailing the exact manner in which this was to be accomplished, the contract gave Blake the discretion to employ the means it deemed best to achieve this goal, including underground installation. Second, because the electrical feeder system could not be installed exactly as depicted by the Navy's drawings, and some alterations were necessary to avoid conflict with other trades, the specifications must by definition be "performance" because they did not provide the "road map" characteristically associated with a design specification. Because the specifications are "performance," and because an underground installation was the best way to avoid conflict with other trades in the corridor, Blake concludes that the Navy's directive ordering it to install the conduits overhead constituted a constructive change in the contract.

■ This reasoning obscures the real question in the case. Taking the second argument first, the mere fact that a specification cannot be followed precisely does not, in and of itself, indicate that it is "performance" and not "design." Were this true, any specification intended to be a design specification would be transformed into a performance specification if it were faulty. This is nonsensical; common sense dictates that the contractor does not acquire unfettered discretion to complete the contract in any manner it sees fit, just because one aspect of the specification might be defective. *See J.L. Simmons*, 412 F.2d 1360 (contractor brought flaws in design specifications to government's attention, proceeded under government's direction, and was entitled to equitable adjustment); *S.W. Elecs. & Mfg. Corp. v. United States*, 228 Ct.Cl. 333, 655 F.2d 1078, 1081 (Ct.Cl.1981) (same). The fact that the electrical conduits could not be installed overhead in the precise manner depicted by the drawings, and at some points had to be installed outside the corridor itself, did not automatically relieve Blake of the obligation to install them overhead.

■ More generally, the problem with both of Blake's arguments is that the distinction between design and performance specifications is not absolute, and does not dictate the resolution of this case. Contracts may have both design and performance characteristics. *See, e.g., Utility Contractors, Inc. v. United States*, 8 Cl.Ct. 42, 50 n. 7 (1985) ("Certainly one can find numerous government contracts exhibiting both performance and design specifications."), *aff'd mem.*, 790 F.2d 90 (Fed.Cir. 1986); *Aleutain Constructors v. United States*, 24 Cl.Ct. 372, 379 (1991) ("Government contracts not uncommonly contain both design and performance specifications."). It is not only possible, but likely that a contractor will be granted at least limited discretion to find the best way to achieve goals within the design parameters set by a contract. *See, e.g., Penguin Indus., Inc. v. United States*, 209 Ct.Cl. 121, 530 F.2d 934, 937 (1976). "On occasion the labels 'design specification' and 'perfor-

mance specification' have been used to connote the degree to which the government has prescribed certain details of performance on which the contractor could rely. However, those labels do not independently create, limit, or remove a contractor's obligations." *Zinger Constr. Co. v. United States*, 807 F.2d 979, 981 (Fed.Cir.1986) (citations omitted). These labels merely help the court discuss the discretionary elements of a contract. It is the obligations imposed by the specification which determine the extent to which it is "performance" or "design," not the other way around.

The real issue is not whether the drawings and diagrammatic notes in their entirety should be labeled design specifications or performance specifications, but how much discretion the specifications gave Blake in the placement of the electrical feeder system. This is a question of contract interpretation which is a matter of law for this court to decide. *R.B. Wright Constr. Co. v. United States*, 919 F.2d 1569, 1571 (Fed.Cir.1990). Although the trial court's opinion may be helpful, we are not bound by it. *J.B. Williams, Co. v. United States*, 196 Ct.Cl. 491, 450 F.2d 1379, 1388 (1971). There is no question that the diagrammatic notes gave the electrical contractor some discretion to work around the other trades, but we think the Claims Court defined too broadly the amount of discretion permitted under the contract.

■ "Contracts are viewed in their entirety and given the meaning imputed to a 'reasonably intelligent contractor' acquainted with the involved circumstances, regardless of whether labelled 'design,' 'performance,' or both." *Zinger Constr.*, 807 F.2d at 981 (citing *J.B. Williams*, 450 F.2d at 1388). We believe that a reasonable contractor would understand that the contract required more than mere avoidance of conflict with the other trades. The specifications, viewed as a whole, additionally required installation of the conduits overhead within the confines of the corridor. This is the only conclusion that gives meaning to the drawings. An interpretation which

gives reasonable meaning to all parts of a contract is preferred to one which renders part of it insignificant or useless. *Hills Materials Co. v. Rice*, 982 F.2d 514, 517 (Fed.Cir.1992). All the drawings depicted overhead installation of the electrical conduits and, more specifically, showed either an exposed or concealed installation depending on their position along the length of the corridor. An interpretation permitting underground installation renders these drawings meaningless. Accordingly, the government's interpretation of the specifications is the only reasonable one.

Contrary to Blake, we do not revisit the Claims Court's fact findings to reach our conclusion. The Claims Court thought the specifications were "performance" for several nondispositive reasons—first, the diagrammatic notes indicated the drawings need not be followed exactly; second, the evidence showed an underground installation was better than an overhead installation; and third, industry practice favored underground installation. As we have observed, the meaning of the diagrammatic notes is a matter of law. Because we conclude the contract did not permit Blake to install the electrical conduits underground, whether or not this method would have been "better" is irrelevant. Finally, whether local trade custom was to install electrical conduits underground is also irrelevant here. Contracting parties may freely choose to have work performed in a specified manner; here, the government opted to install the electrical conduits overhead, even if this was not the usual mode.

## CONCLUSION

Accordingly, the judgment of the Court of Federal Claims is reversed.

REVERSED.