DILLINGHAM CONSTRUCTION,
N.A., INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 93–636C.

United States Court of Federal Claims.

May 31, 1995.

Daniel B. Hoye, San Francisco, CA, for plaintiff.

Dean L. Grayson, with whom was James M. Kinsella, Asst. Director, Washington, DC, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on defendant's motion for summary judgment, filed pursuant to RCFC 56(c). For the reasons set forth below, the court grants defendant's motion.

## FACTS

### I. Background

This case arose out of a contract between the Veterans Administration and Dillingham Construction, N.A., Inc. Under the contract, Dillingham was to provide all labor, materials, tools and equipment necessary to design and construct a two-story outpatient clinic building (the facility). The project began after the VA determined that the existing hospital in Martinez was seismically unsafe. Because the hospital serviced several hundred patients at the time the VA made its determination, a new facility was required as soon as possible. With this in mind, the VA entered into a fast-track, design-build contract, which required completion within 183 days of the notice of award.

This suit was initiated by Dillingham acting on behalf of its subcontractor, Sasco/Valley Electric, which provided electrical work on the project. Sasco sought an equitable adjustment for costs arising from defendant's enforcement of more stringent electrical specifications than Sasco contends were required by the contract. Specifically, Sasco alleged that the government wrongfully denied its proposed use of: (1) metal clad cable & plenum rated cable, and (2) Caddy Kon Clips. Plaintiff also claimed that the VA required it to use more conduit supports than reasonably necessary.

### II. Design Responsibilities Under the Contract

The contract was a design/build contract that split responsibility for designing the facility between the VA and Dillingham. The

cover page to the contract described Dillingham's responsibilities:

Contractor shall provide complete construction drawings and specifications for the Clinic Building, based on the preliminary drawings and performance specifications included with this solicitation. The government's Architects and Engineers will provide final construction plans and specifications for site improvements and the Central Mechanical Room prior to the Request for Best and Final Offer.

Each of the parties hired an architectural/engineering firm to assist it with its design responsibilities. The VA hired Anshen & Allen Associates, which in turn subcontracted with Pacific Engineering Associates to assist it with design of the electrical system. Dillingham contracted with Keller & Gannon. Anshen and Allen's role was to review designs produced by Keller & Gannon. To expedite completion of the project, Anshen and Allen would review the designs as they were being produced. Anshen and Allen's role, however, did not include approval of equipment substitutions. Section 01630, paragraph 1(D) of the contract provided, in part: "The Government is the final Arbiter in determining the evaluation and acceptability of the requested substitution."

In dispute in this case was the meaning of certain specifications pertaining to the electrical system. Section 16010, paragraph 1.03(E), discussed Dillingham's responsibility for designing the electrical system:

Contractor is to provide the complete design and is free to provide any design that meets all applicable codes, the design Build Criteria and the *Electrical Specifications*.

(Emphasis added.)

III. Electrical Specifications

One of the electrical specifications included in the contract required that Dillingham use raceways to run conduit through the facility. Section 16050, paragraph 2.02 stated, in part:

2.02 RACEWAYS

A. Raceways: complete with Boxes, Fittings and Accessories.

B. Raceways:

1. All conduits shall be minimum ½ inch, except as noted or required for wiring. Minimum ¾ inch shall be used below grade, in slab and for the Fire Alarm System.

2. Rigid steel conduit; full weight pipe, galvanized, threaded.

3. Intermediate metal conduit (IMC); light weight steel pipe, galvanized, threaded.

4. Electrical metallic tubing (EMT); thin wall pipe, galvanized, threadless.

5. Polyvinyl chloride conduit (PVC); heavy wall, self extinguishing, Schedule 40.

6. Flexible steel conduit; continuous single strip, galvanized, PVC covered for liquid type.

Several other sections required that the contractor use raceways to house wiring for specific systems, which included: the alarm system (section 16050), the nurse call system (section 16750), the public address system (section 16770), and the data system and master antenna system (section 16010).

The specifications also described the method of supporting raceways:

C. Supports shall be as follows:

1. Ceiling trapeze, strap hangers, or wall brackets.

2. U-bolt or pipe straps at each grating level of riser raceways.

3. Raceways shall be secured to support with pipe straps or U-bolts.

4. Spacing shall be a maximum 10 foot on centers for metallic conduit and wireways.

5. Supports shall be mounted to structure with:

a. Toggle bolts on hollow masonry.

b. Expansion shields or insets on concrete.

c. Machine screws on metal.

d. Wood screws on wood.

e. Nails, rawl plugs or wood plugs shall not be permitted.

Section 16050, paragraph 3.06(C).

## IV. Sasco's Proposed Use of Metal Clad Cable

In lieu of using raceways to house the electrical wiring, Sasco proposed using metal clad cable (MC cable).[1] On February 4, 1992, Dillingham submitted to the VA its "Electrical Submittal No. 0001," which contained this proposal. The submittal first was reviewed by Pacific Engineering and then was sent with comments to the VA senior resident engineer. As part of its comments Pacific Engineering noted: "Metal Clad Cable is not acceptable for this project." Pacific Engineering also stamped "Rejected" on Section 3.0 of the submittal (the section pertaining to the use of MC Cable).

Upset by the rejection of metal-clad cable, Sasco requested a meeting of all of the design professionals, including Anshen & Allen and Pacific Engineering. Thereafter, a meeting was held on February 28, 1992, at the offices of Keller & Gannon to discuss the matter. Plaintiff alleged that during the course of the meeting, Mr. Kouyoumdjian, a design professional for Pacific Engineering, approved Sasco's proposal to use MC cable. According to defendant, Mr. Kouyoumdjian had not objected to use of MC cable from a technical standpoint, but he wanted to know how much of a credit Sasco would offer to the VA for the use of this less expensive material. Under defendant's version of the meeting, Mr. Kouyoumdjian also noted that the VA would have to give final approval of Sasco's proposal. Neither party asserted that Sasco entertained the idea of offering the VA a credit.

On March 18, 1992, Dillingham submitted Submittal No. 45 to the VA. This submittal included information from Sasco about the use of MC cable on other construction projects, and sections of the National Electric Code addressing MC cable. Five days later Pacific Engineering provided the VA with its review comments on this submittal, which

stated: "MC Cable is not acceptable for branch circuits. Use EMT [electrical metallic tubing] as specified." Pacific Engineering also stamped "Rejected" on the submittal. On that same day the VA resident engineer sent a letter to Dillingham referencing Submittal No. 45. The letter stated, in part:

All electrical and signal systems with the exceptions of telephone system are to be installed in conduit. The proposed MC cable in lieu of EMT for branch circuiting is not acceptable.

At various times during construction of the facility Dillingham expressed its opinions of Sasco's claim. In a letter to Sasco dated April 8, 1992, Dillingham stated:

While we support your effort to obtain approval of these systems [the MC cable] by the V.A., we in no way concur that the contract documents allow their usage.... If this had been a condition of your proposal Dillingham would have awarded the project to a different electrical contractor.

In his monthly report dated May 7, 1992, Dillingham's project manager wrote: "Our research of the specifications indicated that the V.A. acted properly when rejecting this material [the MC cable]." On June 6, 1992, Sasco submitted to Dillingham a claim for $267,604.00—subsequently enlarged to $350,565—for additional costs due to the VA's rejection of MC cable. The VA responded with a June 6, 1992 letter to Sasco, which stated, in part:

competing electrical engineering contractors offered the use of MC Cable as value engineering items when Dillingham was analyzing electrical proposals. It was Dillingham's understanding of the bid documents that MC Cable was not allowable.

Finally, the project manager's June report asserted that "[Dillingham's] analysis of the basis of their [Sasco's] claims indicates that they have little merit...."

## V. Sasco's Proposed Use of Caddy Kon Clips

In May 1992, during construction of the facility, the VA senior resident engineer, Mr.

---

1. MC cable is a factory assembly of one or more conductors, each individually insulated and enclosed in a metallic sheath of interlocking tape, or a smooth or corrugated tube. MC cable is not a raceway or a conduit.

Hsiung, discovered that Sasco was not installing the type of conduit support he believed the contract required. Sasco was using a Kon Clip, which is a spring-fastened clip manufactured by Caddy Fasteners. Sasco's project manager, who was responsible for choosing the Kon Clip, believed the Kon Clip was a "strap hanger," as specified under section 16060, paragraph 3.06(C) of the contract. Mr. Hsiung disagreed, and instructed Sasco to remove the Kon Clips and to replace them with a support allowed by the specifications. Mr. Hsiung also informed Sasco that it could submit a request for substitution for the use of the Kon Clips.

During July 1994, Sasco submitted three separate claims totalling $251,274 for costs to remove the Kon Clips and replace them with conduit support acceptable to the VA. Dillingham forwarded these claims along with Sasco's claims relating to the use of MC cable to the VA, which the VA rejected on October 7, 1994, for lack of proper certification. On February 26, 1993, Dillingham resubmitted Sasco's claims, which this time were properly certified. The contracting officer issued a final decision denying Sasco's claims on August 6, 1993. Plaintiff claimed damages in this court for costs associated with (1) the VA's denial of Sasco's proposal to use MC cable, (2) the VA's rejection of Caddy Kon Clips, (3) and the VA's requirement that Sasco install more conduit supports than required by the contract.[2]

## DISCUSSION

### I. Defendant's Motion for Summary Judgment

Summary judgment is appropriate when "there is no genuine issue as to any material fact [so] that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). In evaluating a motion for summary judgment, any doubt as to whether a genuine issue of material fact exists must be resolved in favor of the non-moving party. *Adickes v.*

*S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Campbell v. United States,* 2 Cl.Ct. 247, 249 (1983). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Chevron U.S.A., Inc. v. United States,* 17 Cl.Ct. 537, 540 (1989), *rev'd on other grounds,* 923 F.2d 830 (Fed.Cir. 1991). When the moving party has carried its burden, the non-moving party must come forward with specific facts showing that a genuine issue for trial exists, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), and the non-moving party may not discharge its burden by cryptic, conclusory, or generalized responses. *See Willetts v. Ford Motor Co.,* 583 F.2d 852, 856 (6th Cir.1978); *Tunnell v. Wiley,* 514 F.2d 971, 976 (3d Cir.1975).

Defendant's motion challenged both the jurisdictional basis and merits of plaintiff's claims. In arguing against the court's jurisdiction, defendant averred that Dillingham filed an invalid claim on behalf of Sasco. According to defendant, a claim filed by a contractor on behalf of its subcontractor is not valid if the contractor does not believe that it is based on good grounds. As to the merits of plaintiff's claims, defendant contends that the specifications did not permit Sasco to install MC cable or Caddy Kon Clips. In addition, defendant alleged that plaintiff failed to provide evidence that the VA required Sasco to install more conduit supports than required by the contract. Although the court disagrees with defendant's jurisdictional argument, it agrees with its arguments on the merits of plaintiff's claims and grants defendant's motion.

### II. Jurisdiction in This Court Is Proper

■ This Court's jurisdiction is defined by the Tucker Act. 28 U.S.C. § 1491 (Supp. 1992). The Tucker Act alone does not create

---

2. In actuality, plaintiff's complaint contained six counts: (1) Constructive Change—Government Direction to Supply Conduit; (2) Constructive Change—Government Direction to Replace Caddy Clips; (3) Breach of Duty to Cooperate; (4) Constructive Change—Performance Specifica-

tions; (5) Constructive Change—Abuse of Discretion; (6) Constructive Change—Labor Inefficiency. All of the counts, however, depend on the three issues mentioned by the court, and resolution of these issues, therefore, constitutes a complete disposition of plaintiff's case.

a substantive right to recover money, but instead waives sovereign immunity under specific conditions. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351–52, 63 L.Ed.2d 607 (1980). In order for this court to exercise jurisdiction over a plaintiff's claims, the claims must be predicated on a constitutional provision, statute, executive department regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (Supp.1992); *Nussinow v. United States*, 23 Cl.Ct. 556, 559 (1991). In this case, plaintiff asserted jurisdiction under the Contract Disputes Act (CDA), which applies to "any express or implied contract . . . entered into by an executive agency. . . ." 41 U.S.C. § 602(a)(4).

The CDA requires that a contractor certify all claims submitted to the contracting officer in excess of $50,000. 41 U.S.C. § 605(c)(1) (1988). The certification must provide that the claim is made in good faith, supporting data are accurate and complete to the best of the contractor's knowledge and belief, and the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable. 41 U.S.C. 605(c)(1); *Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1579 (Fed.Cir.1992); *Hamza v. United States*, 31 Fed.Cl. 315, 320 (1994). Where certification of a claim by a contractor is made on behalf of one of its subcontractors, the certification is not valid unless the contractor believes it is based on good grounds. *Transamerica*, 973 F.2d at 1580 (Fed.Cir. 1992); *United States v. Turner Constr. Co.*, 827 F.2d 1554, 1561 (Fed.Cir.1987). Jurisdiction in this court, however, is not premised on the prime contractor's judgment as to the strength of the claim. *Turner*, 827 F.2d at 1561. "[H]ow the prime contractor itself would resolve the dispute should not be relevant to the certification issue; the prime contractor should not, through the requirement that it certify subcontractor claims, be used as a substitute for the contracting officer or the board in the determination of the merits of the submitted claims under the CDA." *Id.*

Defendant asserted that Dillingham's certification of Sasco's claim was not valid because Dillingham did not believe it was based on good grounds. In making this argument defendant pointed to numerous documents in which Dillingham indicated that Sasco's claim was based on an incorrect interpretation of contract specifications. Plaintiff countered that defendant's argument misapprehends applicable caselaw. Plaintiff is correct. The Federal Circuit has established a liberal standard for what constitutes good grounds. *Id.* As stated above, how a contractor itself would resolve a claim is not relevant to whether a claim filed on behalf of its subcontractor was properly certified. *Id.* All that is required is that the contractor make an unqualified certification that complies with the CDA. *Id.* That was done in this case. Having so decided, the court turns to the merits of plaintiff's claims.

III. The Electrical Specifications Were More Like Design Specifications Than Performance Specifications.

The sticking point in this litigation involved the degree of specificity expressed in the contract's electrical specifications. Defendant averred that the specifications were precise and allowed no room for deviation by the contractor. Sasco countered that they were general guidelines and that the contract afforded the contractor wide latitude in interpreting them. Accordingly, the court must begin its inquiry by determining the nature of the specifications contained in the contract.

In general, specifications are divided into two categories: design specifications, and performance specifications. The difference between design and performance specifications is well settled. Design specifications "describe in precise detail the materials to be employed and the manner in which the work is to be performed." *Blake Constr. Co. v. United States*, 987 F.2d 743, 745 (Fed.Cir. 1993) (quoting *J.L. Simmons Co. v. United States*, 412 F.2d 1360, 1362, 188 Ct.Cl. 684 (1969). They afford no discretion to the contractor, which is " 'required to follow them as one would a road map.' " *Blake*, 987 F.2d at 745 (quoting *J.L. Simmons Co. v. United States*, 412 F.2d 1360, 1362, 188 Ct.Cl. 684 (1969). Performance specifications, however,

" 'set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection.' " *Id.*

■ Plaintiff argued that the electrical specifications are performance standards. The basis for plaintiff's argument was language contained in the cover page of the solicitation for the contract, which stated:

> Contractor shall provide complete construction drawings and specifications for the Clinic Building, based on the preliminary drawings and *performance specifications* included with this solicitation. The government's Architects and Engineers will provide final construction plans and specifications for site improvements and the Central Mechanical Room prior to the Request for Best and Final Offer.

(Emphasis added.) Plaintiff interpreted this language as meaning that *all* of the specifications contained in the contract necessarily were performance specifications. Plaintiff's interpretation is inapt.

First, the plain words of the solicitation do not connote the meaning espoused by plaintiff. The solicitation required only that the contractor base its construction drawings and specifications on the performance specifications provided by the VA. Nowhere did it say that the contractor was excused from complying with design specifications contained in the contract. Rather, the contract specifically limited Sasco to designs that comply with the electrical specifications. Section 16010, paragraph 1.03(E) stated: "Contractor is to provide the complete design and is free to provide any design that meets all applicable codes, the design Build Criteria and the Electrical Specifications."

■ Second, the existence of performance specifications is not incompatible with the inclusion of design specifications. A contract may contain design specifications, performance specifications, or a mixture of both. *Blake,* 987 F.2d at 746; *Mega Constr. Co., Inc. v. United States,* 29 Fed.Cl. 396, 418 (1993). Accordingly, the fact that contractor was to base its drawings on the performance specifications provided by the contract, does not negate the existence of design specifications. In fact, the omission of any reference to design specifications in the cover page is consistent with its meaning. It would be nonsensical to direct the contractor to formulate a design based on design specifications. By their very nature design specifications are extremely precise and do not leave the contractor any leeway in exercising its judgment. Where the contract contained design specifications, there was nothing left to the contractor to formulate, and the court therefore cannot attach any significance to the solicitation's failure to mention them.

Finally, plaintiff's analysis is flawed. According to plaintiff, the court first should determine what type of specifications the contract contains and then use that determination to assist it in understanding what the specifications mean. This approach ignores that the terms "performance specification" and "design specification" are merely labels that help describe the degree of specificity contained by a contractual provision. *Blake,* 987 F.2d at 746. They do not "independently create, limit, or remove a contractor's obligations." *Blake,* 987 F.2d at 746 (quoting *Zinger Constr. Co. v. United States,* 807 F.2d 979, 981 (Fed.Cir.1986)). "It is the obligations imposed by the specification which determine the extent to which it is 'performance' or 'design,' not the other way around." *Blake,* 987 F.2d at 746.

To determine what obligations the electrical specifications impose, the court must look to the specifications themselves. *Blake,* 987 F.2d at 746. In this case the electrical specifications describing the allowable types of raceways and conduit supports are extremely detailed. Therefore, the court finds that they are design specifications. This conclusion, however, does not end the court's analysis. As stated above, the decision that the specifications are design in nature does not say anything about what the specifications mean; it merely aids in describing them. To make a decision on the merits of plaintiff's claim, the court therefore must look beyond the label it attaches to the specifications and examine their exact language in light of plaintiff's claims.

## IV. The Electrical Specifications Did Not Permit Sasco to Use Metal Clad Cable or Caddy Kon Clips.

"It is [well] settled that the Government is entitled to obtain precisely what it contracts for so long as it does not mislead the contractor." *American Elec. Contracting Corp. v. United States*, 579 F.2d 602, 217 Ct.Cl. 338, 350 (1978) (citations omitted); *see also Rixon Elec., Inc. v. United States*, 536 F.2d 1345, 210 Ct.Cl. 309, 320 (1976). As the Court of Claims stated:

> In undertaking a contract, the contractor promises to perform according to the contract specifications, and the Government has the right to insist on contract performance in compliance with them.

*Jet Constr. Co. v. United States*, 531 F.2d 538, 209 Ct.Cl. 200, 208 (1976). Thus, where the specifications in the contract were precise, Sasco was not permitted to deviate from them.

■ A plain reading of the contract's electrical specifications does not support plaintiff's proposed use of MC cable in any part of the facility. Section 16050, paragraph 2.20, which covers the whole contract, precisely states that raceways must be used. Permissible raceways are: rigid steel conduit, intermediate metal conduit, electrical metal tubing, polyvinyl chloride conduit, and flexible steel conduit. Nowhere do the specifications state that MC cable may be used in lieu of raceways. In addition, David Griffy, a Senior Project Manager employed by Sasco, confirmed that MC cable is not a type of raceway. By precisely stating the types of raceways that may be used, the contract did not leave the contractor any other alternative. Sasco had no choice but to comply with the contract's exact requirements or to seek a modification to it. The electrical specifications did not permit Sasco to use MC cable.

■ Similarly, the court finds that the electrical specifications did not permit the use of Kon Clips to support raceways. Section 16050, paragraph 3.06(c) listed the types of allowable supports. Included were ceiling trapeze, strap hangers, and wall brackets. Plaintiff argued that this section required only that Sasco use a support system which will perform the function of any of the listed devices. Plaintiff's argument, however, reads into the specifications language that simply is not there. The specifications in no way state that the contractor may use ceiling trapeze, strap hangers, wall brackets *or their equivalent.* As stated above, the government is entitled to receive what it contracts for. *See, e.g., American Elec.*, 579 F.2d 602, 217 Ct.Cl. at 350. The government contracted for specific types of conduit support. Those types did not include Kon Clips.

Because the court finds that the language of the specifications is clear, it does not apply the rule of construction advocated by plaintiff. Specifically, plaintiff requested that the court apply the rule of *contra proferentum*, which states that an ambiguous contract should be interpreted against the party that drafts it. *See, e.g., United States v. Seckinger*, 397 U.S. 203, 216, 90 S.Ct. 880, 887–88, 25 L.Ed.2d 224 (1970); BLACK'S LAW DICTIONARY 712 (5th ed. 1979). In this case the court finds that the contract is unambiguous, so the doctrine does not apply.

## V. Plaintiff Failed to Provide Evidence That the VA Required Sasco to Install Conduit Support at Four–Foot Intervals.

■ An additional element of plaintiff's complaint was that the VA continually requested that Sasco supply more conduit supports than reasonably necessary in installing the lighting system in the patient area. Confusion over this issue arose from two provisions in the contract. Section 16050, paragraph 3.06(A)(3) of the specifications stated that "[c]onduits shall be securely fastened in place on maximum 10 foot intervals...." However, section 16010, paragraph 1.03(E) required that the electrical system adhere to "all applicable codes." The National Electric Code requires that MC cable be supported and secured at intervals not exceeding 6 feet.[3]

---

**3.** The VA granted Sasco's request to use MC cable in lieu of raceways for the installation of lighting in the patient areas.

In support of its motion defendant argued that Sasco was not required to provide more supports than required by the National Electric Code and therefore the contract. Defendant cited a January 19, 1992 letter written from Tom Trainor, Dillingham's Senior Project Manager, to David Griffy, Sasco's Senior Project Manager. In the letter Mr. Trainor stated:

> There appears to be no consistency in the manner in which Sasco/Valley is securing the flexible lighting cables above the ceiling grid. Following a site inspection by Pacific Engineering on 6/17/92, Sasco/Valley was asked to support those cables in conformance to the National Electric Code as it relates to manufactured wiring systems, and specifically, metal clad cable. Section 334–10(a) of the code states that cable shall be supported at intervals not exceeding 6 feet.

In response, plaintiff alleged that the VA required it to install supports every four feet. However, plaintiff did not adequately support this allegation. Although, plaintiff cited only an excerpt from a deposition of Sasco's Senior Project Manager, Mr. Griffy, it did not attach that excerpt to its response, or otherwise make it available to the court.

An unsupported allegation is not sufficient to create a triable issue of fact. *See Willetts v. Ford Motor Co.*, 583 F.2d 852, 856 (6th Cir.1978); *Tunnell v. Wiley*, 514 F.2d 971, 976 (3d Cir.1975). Plaintiff's assertion that the VA required it to install conduit support a four-feet intervals is such an allegation. Accordingly, the court finds in favor of defendant on this issue.

VI. The VA Did Not Approve Sasco's Proposal to Use MC Cable.

██ As a final matter, plaintiff argued that a triable issue of fact exists about whether the VA approved Sasco's proposal to use MC cable. To answer this question the court must determine whether there was an approval, and if so, whether the approving official had such authority. As evidence of an approval, plaintiff points to the minutes of a February 28, 1992 meeting in which Mr. Kouyoumdjian, a design professional for Pacific Engineering, allegedly approved Sasco's

proposal. Plaintiff found approval authority in the minutes of a January 29, 1992 project start-up meeting, which states in part:

> The VA has designated Anshen & Allen to be their representatives for design review. Dillingham will develop a design schedule which will identify design review milestones together with the overall direction of the design process. It was agreed that due to the time constraints of this project, Dillingham and its consultants must rely on the review of Anshen & Allen as tacit approval of key design elements as they are developed. The review of construction documents by the VA is understood to be an affirmation of the design elements reviewed by Anshen & Allen. Completed design documents for each discipline (structural, architectural, mechanical and electrical) will be delivered to the VA for approval as they are completed. Certain elements of construction must proceed ahead of formal VA approval in order to maintain the schedule.

The court agrees with plaintiff that a triable issue of fact exists concerning whether Mr. Kouyoumdjian approved Sasco's proposal, but finds the issue is moot because Mr. Kouyoumdjian did not have such authority. The January 29, 1992 meeting minutes cited by plaintiff provide evidence that Pacific Engineering, a subcontractor of Anshen & Allen, had authority to approve designs produced by Dillingham and its contractors. Those minutes, however, say nothing about Pacific Engineering's authority to approve changes to the contract. Moreover, the contract speaks directly to that issue. Section 01630, paragraph 1(D) provided, in part: "The Government is the final Arbiter in determining the evaluation and acceptability of the requested substitution."

Sasco's proposal to use MC cable was a request for a substitution. Accordingly, only the VA contracting officer had the authority to approve it, and Mr. Kouyoumdjian's alleged approval could not have been valid.

CONCLUSION

Defendant's motion for summary judgment challenged this court's jurisdiction over plaintiff's claims and the merits of plaintiff's

claims. The court disagrees with defendant's jurisdictional argument, but agrees with its arguments as to the merits of plaintiff's claims, and therefore grants defendant's motion. This case is dismissed.

**IT IS SO ORDERED.**