**THERMOCOR, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 93–278 C.**

United States Court of Federal Claims.

May 1, 1996.

Thomas H. Asselin, Atlanta, Georgia, for plaintiff. L. Bruce Stout, Atlanta, Georgia, and Vincent O. Manuele, Philadelphia, Pennsylvania, of counsel.

Carol L. Wallack, Washington, DC, for defendant. Donald M. Harris, New York City, of counsel.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court after argument on the parties' cross motions for partial summary judgment. The parties seek summary judgment with respect to one of nine counts raised in plaintiff's complaint. For the reasons set forth below, the court denies plaintiff's motion for partial summary judgment and grants in part and denies in part defendant's cross motion.

## FACTS

This case arises from contract No. DACW41–90–C–0002, which the United States Army Corps of Engineers (the "Corps") awarded ThermoCor, Inc. ("ThermoCor") on October 16, 1989 for the total price of $15,500,000. The contract required, among other things, the excavation and treatment of soils contaminated with polychlorinated biphenyls ("PCBs") and the restoration of the Wide Beach Development Site in Erie County, New York. ThermoCor subcontracted with SoilTech ATP Systems, Inc. ("SoilTech") for performance of part of the contract, specifically for treatment of the contaminated soils with a PCB dechlorination process.[1]

The contract was procured as a result of site investigations conducted by the Environmental Protection Agency (the "EPA"). These investigations revealed that for about ten years, the residents of Wide Beach had applied waste oil, which contained PCBs, to the dirt roads surrounding their properties to prevent the dust from the roads from rising. In September 1985, the EPA submitted a Record of Decision (the "ROD"), that advised

---

1. PCB dechlorination refers to the chemical reaction of polychlorinated biphenyls with an alkali polyethylene solution to render the polychlorinated biphenyls non-hazardous.

excavation of contaminated soils with PCB concentrations greater than or equal to 10 mg/kg. The ROD estimated that about 28,-750 cubic meters, or approximately 37,600 cubic yards, of PCB contaminated soils required excavation and treatment. This figure consisted of soils from the roadways, drainage ditches, driveways, wetlands, entire front yards,[2] limited portions of backyards, and contaminated open lots. (Pl.'s App.Ex. 7; Def.'s App. at 359, 362.)

A later study funded by the EPA and the New York State Department of Environmental Conservation found that identifying all contaminated soils was very difficult. Further sampling of the soils during and after remediation work was allegedly necessary. (Def.'s App. at 199–200.) The EPA contracted with Ebasco Services, Inc. ("Ebasco") to perform additional investigative work. In a February 1989 document, Ebasco concluded that PCB contamination did not extend to the entire portions of the front yards, as originally thought by the EPA, but was confined to small areas close to the road. (Def.'s App. at 394–95.) Thus, when the Corps issued its Request for Proposals (the "RFP") in May 1989, for performance of the cleanup work, it estimated the quantities to be excavated and treated at an amount less than that indicated in the ROD.

The contract contained various pay items upon which plaintiff bid, three of which involved estimated quantities relevant to the cross motions before this court. Item 6, Excavation of Contaminated Soils,[3] had an estimated quantity of 19,000 cubic yards at a contract unit price of $19.99 per cubic yard; Item 14, PCB Dechlorination Process,[4] had an estimated quantity of 21,000 tons at a contract unit price of $375.30 per ton; and Item 15, Offsite Transportation and Disposal, had an estimated quantity of 1,000 tons at a contract unit price of $434.27 per ton. (Pl.'s App.Ex. 1.) The Corps used a conversion

factor for the amount of soil to be excavated and treated equal to 1.105 tons/cubic yards (21,000 tons/19,000 cubic yards).

By letter dated March 7, 1990, ThermoCor received a Notice to Proceed. ThermoCor and SoilTech commenced excavating and processing the contaminated soils in September and October 1990. Anticipating increases in quantities to be processed under Bid Items 14 and 15 by spring 1991, ThermoCor sent a letter on April 3, 1991 to the Corps, requesting an equitable price adjustment to Bid Item 14, among others, pursuant to the Variance in Estimated Quantity clause (the "VEQ clause"). (Pl.'s App.Ex. 48.)

The Corps directed ThermoCor and Soil-Tech to continue performance of the contract. During this time, the parties corresponded about price adjustments and cost information for the increased quantities that were excavated and processed. Pursuant to this information, the Corps issued two contract modifications for payment of the over-run quantities under Bid Items 14 and 15. Modification P00013 provided for payment of the contract price for quantities greater than 100 percent but less than 115 percent of the estimated quantities. Modification P00014 (PT I) allowed for payment of the contract price in excess of 115 percent of the estimated quantity to a maximum of 30,450 tons. However, Modification P00014 (PT II) reserved the Corps' right to seek a downward adjustment in the contract price based on an audit of actual costs of the overruns for Bid Items 14 and 15. (Pl.'s App.Ex. 55.) ThermoCor rejected the latter because actual costs had allegedly increased; thus, it sought an equitable adjustment based on the increased, actual costs of performance under both bid items.

On July 18, 1991, ThermoCor submitted a Request for Equitable Adjustment (the "REA") to the Corps for claims including differing site conditions, delays and disrup-

---

**2.** The figure seems to include all of the total soil in the front yards regardless of the 10 mg/kg PCB contamination requirement. (Def.'s App. at 231.)

**3.** Representative samples of contaminated soils were not available and could not be obtained by the bidders. Answers to Questions Raised at the

Pre–Proposal Conference, July 7, 1989, at 9 (Pl.'s App.Ex. 29).

**4.** The contract specified a PCB technology to be used. While the process had been developed and laboratory tested, its design was not fully complete. (Pl.'s App.Ex. 16.)

tions, and variations in estimated quantities.[5] By September 1991, ThermoCor and Soil-Tech completed processing and transporting offsite all of the excavated contaminated soils. The amount of soil actually excavated was 22,607 cubic yards, 3,607 cubic yards above the contract estimate. (Pl.'s App.Ex. 73.) The Corps calculated that 41,735.43 tons of contaminated material was dechlorinated, 20,735.43 tons over the contract estimate. (Pl.'s App.Ex. 73.) This figure, however, is disputed. The Corps argues that the original estimate was not adjusted for moisture but that the final amount was adjusted. Plaintiff claims that both figures were adjusted for moisture. Under Bid Item 15, the final quantity transported was about 1,620 tons, 620 tons over the contract estimate. (Pl.'s App.Ex. 75.)

On April 6, 1992, ThermoCor submitted a claim to the Corps requesting an equitable adjustment for the overrun quantities under Bid Items 14 and 15 pursuant to the VEQ clause. The contracting officer did not act on this portion of claim. On May 4, 1992, however, the contracting officer did issue a decision on ThermoCor's REA. (Pl.'s App. Ex. 74.) The contracting officer denied some of the claims, but failed to act on others, specifically the variation in estimated quantities claim; the latter are thus deemed denied.[6]

ThermoCor filed its complaint in this court, on behalf of itself and SoilTech, on May 4, 1993 asserting nine counts and requesting damages for additional time and expenses allegedly due to, *inter alia:* (1) differing site conditions; (2) changes, delays and additional requirements by the contracting officer; (3) misleading and defective contract specifications causing plaintiff to process waste water offsite and to pay royalties for technology required by the contract; and (4) the need to process and transport additional quantities of soil. ThermoCor then filed a motion for partial summary judgment on April 3, 1995 to which the government responded with a cross motion on June 5, 1995. These motions only address entitlement of an equitable adjustment for performance of work on unit-priced Bid Items 14 and 15 in excess of the quantities which were estimated in the contract, with the parties to negotiate quantum. Oral argument on the cross motions was conducted on March 27, 1996, after the parties attempted but failed to settle the case in its entirety.

## DISCUSSION

### I. Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c). In evaluating a motion for summary judgment, any doubt as to whether a genuine issue of material fact exists must be resolved in favor of the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Campbell v. United States,* 2 Cl.Ct. 247, 249 (1983). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the court does not "weigh the evidence and determine the truth of the matter but [only] determine[s] whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511. Not until the moving party has met its burden of showing entitlement to judgment as a matter of law does the

---

5. ThermoCor's REA sought recovery for:

| Items Agreed Between the [Corps] and ThermoCor | $ 8,595,798 |
|---|---|
| Delay in Initial Stages | 100,321 |
| Differing Site Conditions | 1,981,514 |
| Subcontractor Claims (variations in quantities) | 8,548,571 |
| CPL Insurance and Bond on CPL Insurance | 217,756 |
| GRAND TOTAL | $19,443,960 |

| Additional Time Required | 166 days |
|---|---|

(Complaint at 22.)

6. The Contracting Officer's decision was as follows: denial of differing site conditions by $7,921,273.00; denial of delays in initial stages by $894,884.00; denial of soil pH adjustment costs by $300,002.00; and recognition of 156 days for extended contract duration. (Pl.'s App. Ex. 74.)

burden shift to the non-moving party to provide facts establishing that a genuine issue for trial exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Neither party may discharge its burden by cryptic, conclusory, or generalized responses. *See Willetts v. Ford Motor Co.*, 583 F.2d 852, 856–57 (6th Cir.1978); *Tunnell v. Wiley*, 514 F.2d 971, 976 (3d Cir.1975).

■ When the parties have filed cross motions for summary judgment, as in the instant case, the court must evaluate each motion on its own merits. The fact that both parties argue in favor of summary judgment and allege that there are no genuine issues of material fact for trial does not relieve the court of its duty to decide whether summary judgment is appropriate. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir. 1987)). Cross motions are no more than a claim by each party that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not establish that if one is rejected the other must necessarily be allowed. *Rains v. Cascade Indus., Inc.* 402 F.2d 241, 245 (3d Cir.1968). The court must "draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987).

Plaintiff asks the court to grant partial summary judgment on the ground that it is entitled to an equitable adjustment in the contract price reflecting the actual costs of performance plus a reasonable profit for the quantity of soil processed and transported under Bid Items 14 and 15, respectively, in excess of the quantities estimated in the contract. Plaintiff claims four alternative theories for this entitlement: (1) its reasonable interpretation of the VEQ clause warrants an equitable adjustment for the quantities which exceed 115 percent of the contract estimates; (2) defendant's orders to process and transport offsite excess quantities of soil constitute a "cardinal change" beyond the scope of the original contract; (3) the Changes clause supports an equitable adjustment; and (4)

defendant's lack of due care in preparing the estimates for the bid items in question entitles it to an equitable adjustment.

Defendant argues that plaintiff is not entitled to an equitable adjustment because the VEQ clause only provides for an equitable adjustment if the increased costs were due solely to the increased quantities and plaintiff cannot prove this. Defendant contends that plaintiff's other theories are improperly raised before the court because (1) they were not submitted to the contracting officer nor claimed in the complaint and (2) the VEQ clause controls the claim.

A comprehensive analysis of the parties' memoranda, voluminous appendices, and oral argument leads the court to conclude that (1) plaintiff's claim under the theory of lack of due care is inappropriately raised and (2) several genuine issues of material fact preclude summary judgment on plaintiff's other theories.

## II. The Variation in Estimated Quantity Clause

At the heart of this dispute lies the VEQ clause. The VEQ clause provides, in pertinent part:

> If the quantity of a unit-priced item in this contract is an estimated quantity and the actual quantity of the unit-priced item varies more than 15 percent above or below the estimated quantity, an equitable adjustment in the contract price shall be made upon demand of either party. The equitable adjustment shall be based upon *any increase or decrease in costs due solely to the variation* above 115 percent or below 85 percent of the estimated quantity.

48 C.F.R. § 52.212–11 (1989) (emphasis added). Plaintiff claims that this clause is ambiguous and, as such, its reasonable interpretation of the clause should govern. Plaintiff contends that an equitable adjustment for work on quantities greater than 115 percent of those estimated in the contract is automatically due and should be based on the costs associated with the overrun quantities, equalling actual costs plus a reasonable profit for said overruns, regardless of whether unit costs have changed. Defendant asserts that

the VEQ clause is not ambiguous pursuant to the United States Court of Appeals for the Federal Circuit's decision in *Foley Co. v. United States*, 11 F.3d 1032 (Fed.Cir.1993). It urges that an equitable adjustment in price is appropriate under the clause only when an increase in quantity causes a change in unit costs.

The primary issue before the court involves the interpretation of the VEQ clause and particularly its language "due solely to the variation." While the parties know that they are locked into the contract unit price for quantities up to 115 percent of the amounts estimated in the contract, they disagree as to how the equitable adjustment above that amount should be calculated. The question is whether the phrase "increase or decrease in costs due solely to the variation" means the difference between the actual costs of the overrun (the adjustable amount) versus the contract unit price or the difference between the actual costs of the overrun versus the actual costs of the base quantity (the nonadjustable amount), that is the amount equal to or less than 115 percent of the estimated quantity.

■■■ Contract interpretation begins with the plain meaning of the clause at issue and a determination of whether it is ambiguous. *Id.* at 1034. A contract's interpretation must be one most reasonable in a given set of circumstances. If the language is ambiguous, the court must investigate the parties' intentions or reasonable interpretations using an objective test. JOHN CIBINIC, JR. & RALPH C. NASH, JR. ADMINISTRATION OF GOVERNMENT CONTRACTS 143, 145–46 (1995). When an investigation of the parties' intent does not compel a particular interpretation, the contract remains ambiguous and the rule of *contra proferentum* applies. Under the rule, the contract is interpreted against the drafter, and a duty is imposed upon the contractor to seek clarification if the ambiguity is patent. The contractor, however, must have relied upon its asserted interpretation. *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed.Cir.1986).

In the instant case, plaintiff claims that the VEQ clause is ambiguous because it is susceptible to differing reasonable interpretations. Plaintiff relies on the fact that this court has interpreted the clause differently in the past. *Compare Burnett Constr. Co. v. United States*, 26 Cl.Ct. 296 (1992), *with Foley Co. v. United States*, 26 Cl.Ct. 936 (1992), *aff'd*, 11 F.3d 1032 (Fed.Cir.1993), *and Victory Constr. Co. v. United States*, 206 Ct.Cl. 274, 510 F.2d 1379 (1975). There are only four cases which specifically address the interpretation of the VEQ clause. The first is *Victory Constr. Co. v. United States*, decided in 1975, in which the contractor performed work on unit-priced items, involved in the modification of certain flood control structures, in excess of the estimates in the contract. *Victory*, 206 Ct.Cl. at 277, 510 F.2d 1379. The government made payment on the excess quantities based on the average cost of the total work. The contractor filed a claim with the contracting officer asserting that since there had been no realization of unit cost economies by reason of the extra volume of work, payment on the quantity overrun should have been made based on the contract unit price. *Id.* at 279–80, 510 F.2d 1379. The contracting officer did not agree that the clause authorized an approach to pricing overruns by reference to a demonstrated differential between the costs of performing the overrun versus the costs of performing the base, but rather allowed an equitable adjustment based on the average cost of the entire work (base and excess), which was less than the contract unit price. *Id.* at 280, 510 F.2d 1379. The court held for the contractor finding that the VEQ clause only authorizes a deviation from the contract unit price to reflect a difference in the performance costs directly attributable to a volume differential.[7] *Id.* at 287, 510 F.2d 1379. The court found that the clause did not contemplate a complete repricing of the contract. *Id.* In other words, an equitable adjustment for changes in quantities was only available if there was a realization of cost economies or diseconomies by reason of the excess work. The only logical

---

7. In 1968, the language at issue was added to the 1965 version of the clause. The court held that

this addition was only a clarification of the clause not an alteration.

conclusion of *Victory* is that realization of cost economies or diseconomies attributable to excess volume means a change in the unit costs between the base, nonadjustable quantity and the excess, adjustable quantity.

The clause was next interpreted in 1989 by the Board of Contract Appeals (the "Board") in *Appeal of Bean Dredging Corp.*, 89–3 BCA ¶ 22,034, ENG. BCA No. 5507, 1989 WL 81107 (1989). The Board found for the contractor, holding that it was entitled to an equitable adjustment equal to the difference between the actual costs of performance on unit-priced items in excess of 115 percent of the units estimated in the contract and the contract unit price. In an attempt to distinguish *Victory*, the Board stated that (1) the contract in *Victory* did not include a Pricing of Adjustment clause and (2) the actual costs of the nonadjustable quantity did not differ materially from the contract unit price in *Victory* as it did in *Bean*. *Id.* at 110, 821. The Federal Circuit, however, has found these distinctions irrelevant. *See Foley*, 11 F.3d at 1035–36. In 1992, this court took a similar position as the Board in *Bean Dredging*. The court in *Burnett Constr. Co. v. United States* held that the contractor was entitled to an equitable adjustment based on the difference between the contract price and the cost of additional quantities of water required during a construction project, even though the unit costs for providing the additional amounts of water did not increase as a result of the overrun. *Burnett*, 26 Cl.Ct. at 307–08. Although the contractor failed to demonstrate that the increase in unit costs of the overrun was attributable to the increase in volume, the court held that due to large variations some adjustment to unit prices had to be made to prevent windfalls. Thus the contractor was entitled to its actual costs plus a reasonable profit for the overrun. *See id.* at 303. The court claimed that directly attributable to volume deviation was not synonymous with the concept of "on account of a quantity overrun" and that the *Victory* court's interpretation of the clause was only dicta. *Id.* at 305, 307. The court does not find these rationales persuasive.

In the same year that this court decided *Burnett*, it decided *Foley Co. v. United States*. In *Foley*, the contractor sought recovery for the full contract price for removal and disposal of sludge, in hazardous waste lagoons, of quantities in excess of those estimated in the contract. The government counterclaimed, seeking an equitable adjustment in the contract price under the VEQ clause because the contractor's costs had decreased. The court, relying on *Victory*, held that the government was not entitled to the adjustment in the absence of proof that the contractor experienced per-unit cost savings due solely to sludge removed in excess of the quantity estimated in the contract. *Foley*, 26 Cl.Ct. at 943. The court noted that the rationale and holding of *Burnett* was not convincing nor persuasive. *Id.* at 944. The court further stated that the Board's reasoning in *Bean Dredging* did not comport with the language of the VEQ clause. *Id.* at 943. The court specifically held that the proponent of an adjustment must show that there were "unit cost differentials between the base and excess units and that the differentials resulted from economies [or diseconomies] of scale associated with the quantity overrun [or underrun]." *Id.* at 943. It reasoned that the clause deals exclusively with unit pricing; thus, costs in the context of the clause cannot refer to total costs. *Id.* The court stressed *Victory's* clear rejection of a complete repricing standard. *Id.* at 944.

Plaintiff claims that because of these cases, the clause is ambiguous and its position is reasonable since the government championed it in *Foley* and *Victory*. Plaintiff reasons, therefore, that its interpretation should govern pursuant to the rule of *contra proferentum*. In the face of the differing rationales of these cases, it seems that the clause may be ambiguous. However, the Federal Circuit's decision in its review of the *Foley* case took away any seeming ambiguity. In affirming the lower court's decision in *Foley*, the Federal Circuit held the plain meaning of the clause must control. It reasoned that an equitable adjustment under the VEQ clause requires proof of an actual increase or decrease in costs due solely to the variation above 115 percent or below 85 percent of the estimated quantity. *Foley*, 11 F.3d at 1034–35. In light of the government's stipulation that it could not demonstrate that Foley's

unit costs for sludge removal decreased solely as a result of the amount removed in excess of 115 percent, *id.* at 1033, the contractor was entitled to the contract unit price for the overrun not the lower amount of actual costs plus a reasonable profit. *See id.* at 1036.

■ Although the parties did not challenge the clause's ambiguity in *Foley,* the Federal Circuit still examined its legislative history to determine the drafter's intent in promulgating it. In 1968, the controversial portion of the clause was added: "The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above 115 percent or below 85 percent of the estimated quantity." This revision was " 'to make more explicit that only the quantities which exceed 115%, or are less than 85% of the estimated quantities are subject to adjustment under this clause.' " *Id.* at 1034 (citing DEPARTMENT OF DEFENSE, ARMED SERVS. PROCUREMENT REGS., 1963 ED.REV. NO. 27 III (Apr. 15, 1968)). The Federal Circuit held that nothing in the clause's legislative history indicates that an equitable adjustment should be based on the contractor's actual costs plus a reasonable profit. *Id.* at 1034–35. The Federal Circuit relied upon the Court of Claims' decision in *Victory* which held that an equitable adjustment was not warranted absent a showing by a preponderance of the evidence of "the realization of cost economies attributable to excess volume." *Id.* at 1035 (citing *Victory,* 206 Ct.Cl. at 288, 510 F.2d 1379). Neither the courts in *Foley* nor *Victory* found a basis in the clause to allow for a repricing of overruns without adequate evidence of changes in unit costs due to excess work. Therefore, the court does not find the clause ambiguous; therefore, the rule of *contra proferentum* does not apply.

■ Plaintiff claims that it relied upon its interpretation that an equitable adjustment should be based on changes in total costs rather than unit costs because this was the position championed by the government in both *Foley* and *Victory.* First, the government's intent when asserting claims before the courts is not an issue. Evidence of practices cannot overrule unambiguous contract provisions. Second, the court was unable to find any evidence of reliance on this interpretation in obtaining the contract. There is no clear evidence that plaintiff questioned the contracting officer about the clause's interpretation, even though the *Victory* decision existed at the time the contract was procured. *Perry & Wallis, Inc. v. United States,* 192 Ct.Cl. 310, 315, 427 F.2d 722 (1970) (holding that prior cases put persons on notice of interpretations to investigate any intended meaning). Moreover, plaintiff's primary reliance on the court's interpretation in *Burnett* is curious since it was decided at the same time as *Foley.*

In *Victory,* the court noted that absent exceptional circumstances, the language of the clause must be accorded its ordinary meaning. *Victory,* 206 Ct.Cl. at 287, 510 F.2d 1379. This case presents a situation where the contractor seeks an equitable adjustment when its total costs increased as a result of increased quantities. This contrasts with the more common situation of the government attempting to obtain a price reduction because increases in quantities caused costs to decrease since a contractor becomes more efficient as a job continues. If the government cannot prove that unit costs decreased, it must continue to pay the contract unit price. The government, however, can protect itself from providing a windfall to the contractor through its authority under the Changes clause, or the Termination for Convenience clause, to eliminate the excess work. The contractor, on the other hand, does not have any such protections. Although the court is troubled by this apparent inequity, it cannot ignore the Federal Circuit's decision which recognized the inequity but held fast to the ordinary meaning of the clause. *Cf. Foley,* 11 F.3d at 1036 (J. Lourie, concurring in the decision "only on the basis of the precedential authority of *Victory,*" but stating that "the VEQ clause should be interpreted to require a determination of the net increase or decrease in total cost resulting from the variation, rather than a change in unit cost").

■ Relevant to the case at bar, whether the cost of processing and transporting one

ton of the overrun was greater than the cost of processing and transporting one ton of the basic contract quantity is at issue. It is a question which cannot be decided on the facts before the court. If plaintiff cannot prove this, it will not be entitled to an equitable adjustment under the VEQ clause. *Id.* at 1034–35; *Victory,* 206 Ct.Cl. at 288, 510 F.2d 1379. Without evidence of these material facts, the court is precluded from entering summary judgment on this claim.

## III. The Cardinal Change Doctrine and the Changes Clause

As an alternative argument, plaintiff contends that in processing and transporting offsite materials in excess of the estimated contract quantities, it and SoilTech performed work beyond the scope of the contract. This additional work, plaintiff argues, constitutes a "cardinal change" for which it should be awarded an equitable adjustment. Should the court not find a cardinal change, plaintiff contends that the Changes clause prescribes an equitable adjustment right. Defendant maintains at the outset that plaintiff improperly raises these theories of relief because it had not raised them in its request for an equitable adjustment submitted to the contracting officer or in its complaint.

### A. Jurisdiction

Plaintiff submitted a claim to the contracting officer for, *inter alia,* an equitable adjustment in the amount of $8,548,571 based on the requirement to perform work on quantities in excess of the contract estimates. By letter dated May 4, 1992, the contracting officer rendered a decision on some of plaintiff's claims but neglected to decide its claim of increased quantities. Plaintiff couched its request for relief in terms of the VEQ clause in both its claim to the contracting officer and its complaint. Plaintiff accounts for its request pursuant to the cardinal change rule and the Changes clause now by maintaining that these are alternative theories under which it has a right to an equitable adjustment for the excess work.

A prerequisite to access to this court is that the claim at issue first be certified and submitted in writing to the contracting offi-

cer pursuant to 41 U.S.C. §§ 605(a), 605(c) (1994). A contractor may change the amount of his claim, but may not raise any new claims not subject to a decision by the contracting officer. *Santa Fe Eng'rs, Inc. v. United States,* 818 F.2d 856, 858 (Fed.Cir. 1987) (citing *J.F. Shea Co. v. United States,* 4 Cl.Ct. 46, 54 (1983)). For example, the court in *Santa Fe* held that plaintiff could not raise a claim for relief based on "all the problems, changes and directives issued on the project" because it had only submitted a claim to the contracting officer based on two specific change orders. *Id.* at 859.

Nonetheless, it would be very disruptive to a court's procedures, if theories, developed as a result of pretrial proceedings including discovery, had to be submitted to the contracting officer before the court could render a final decision on a claim. *See J.F. Shea Co. v. United States,* 4 Cl.Ct. 46, 54 (1983). Therefore, a court has jurisdiction over a claim if it is "based on the same set of operative facts underlying the claim" submitted to the contracting officer. *Cerberonics, Inc. v. United States,* 13 Cl.Ct. 415, 417 (1987). The critical test is whether the contracting officer's right to adjudicate the claims is undermined by circumventing his statutory role "to receive and pass judgment on the contractor's entire claim." *Id.* at 418. In this case, the contracting officer did not even address plaintiff's claim of processing and transporting increased quantities. Thus, his role would not be jeopardized if the court hears alternative theories for relief based on a requirement to complete extra work.

The instant case is not one where plaintiff has raised an entirely new claim. *See, e.g., Kunz Constr. Co. v. United States,* 12 Cl.Ct. 74, 79 (1987) (finding that the court did not have jurisdiction over a claim based on increased home-office overhead, because its claim to the court did not include this item). The factual bases for the equitable adjustment claim for increased quantities were submitted to the contracting officer. Plaintiff has not raised a claim for any additional expenses or items; plaintiff advances the same claim for payment of actual costs of performance plus a reasonable profit for

overrun quantities arising from the same directives to process additional quantities of soil above contract estimates. Plaintiff merely "augments the legal theories underlying its claim. But it does not change the essence of that claim...." *Cerberonics,* 13 Cl.Ct. at 419. Defendant is not prejudiced by plaintiff raising these theories. As a result, there is no jurisdictional bar to considering these alternative theories.

## B. Cardinal Change Theory

Plaintiff contends that under the Corps' directives, SoilTech was required to treat 41,735 tons of material compared to 21,000 tons estimated in the contract. Plaintiff was also required to transport offsite about 620 tons of soil over the 1,000 tons estimated in the contract. Plaintiff claims that such overruns qualify as a cardinal change under *Saddler v. United States,* 152 Ct.Cl. 557, 287 F.2d 411 (1961). Plaintiff further claims that it would be inequitable to require it and SoilTech to bear the risk of quantity overruns where the dechlorination technology specified in the contract was new and uncertain. Defendant, on the other hand, argues that ThermoCor and SoilTech only treated 33,360 tons of dry soil not 41,735 tons. Defendant also asserts that because the contract was a performance specification contract, plaintiff was "clearly responsible for any 'uncertainties' in performing" the work.

■ ThermoCor's contract contains a standard Changes clause which permits the government to make changes in work within the general scope of the contract. The clause, however, does not authorize cardinal changes. A cardinal change is a substantial deviation from the original scope of work that changes the nature of the bargain between the parties. There is no easy or exact formula to determine whether a change is beyond the scope of the contract. *Edward R. Marden Corp. v. United States,* 194 Ct.Cl. 799, 808, 442 F.2d 364 (1971). "Each case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole." *Wunderlich Contracting Co. v. United States,* 173

Ct.Cl. 180, 194, 351 F.2d 956 (1965) (citing *Saddler v. United States,* 152 Ct.Cl. 557, 561, 287 F.2d 411 (1961)). A determination of the scope and nature of alleged changes requires a fact-intensive inquiry into the events that led to the excess work and their effect on the parties. The court must investigate the contract as a whole to determine whether the government is responsible for the contractor's difficulties. *Universal Contracting & Brick Pointing Co. v. United States,* 19 Cl. Ct. 785, 792–93 (1990).

■ Disputes remain over issues that affect whether the government is responsible for plaintiff's difficulties. First, the parties dispute whether plaintiff relied on the contract estimates. Although, the Corps did not allow any sampling of the soils to verify any of the estimates, the government claims that plaintiff could not have relied on the contract estimates to represent accurate amounts because plaintiff was required by the contract to complete post-excavation testing and because the contract stated that the quantities were only estimates. (Def.'s App. at 426–27.) Plaintiff, however, asserts that it relied on the conversion factor in the RFP in bidding the contract and provides a deposition stating that its president did "not really" anticipate changes from the estimates supplied in the contract. (Pl.'s App.Exs. 30, 131.) If plaintiff justifiably relied on the contract estimates, the government may be responsible for plaintiff's difficulties. Reliance, however, is a question of fact which may not be appropriately handled on summary judgment. *Information Sys. & Networks Corp. v. United States,* 34 Fed.Cl. 457, 461 (1995).

The second dispute affecting the government's responsibility is whether the conversion factor in the RFP was too low compared to the factor implied in the ROD and whether defendant knew or should have known this. Plaintiff presents deposition testimony that the quantity estimates were only speculations and that the Corps' conversion factor of 1.105 tons/cubic yards was only a guess. (Pl.'s App.Exs. 23, 26.) While it is prudent to verify quantities if they appear to be problematic, plaintiff presents evidence that no verification was done. (Pl.'s App.Ex. 19.) In contrast, defendant provides evidence

that verification was too difficult and was, rather, required by the contractor. (Def.'s App. at 431.) Further, defendant provides support that the Corps completed investigations which provided reliable information for better estimates than those presented in the ROD. (Def.'s App. at 394–95.) If based on the information and studies, it was reasonable for the Corps to have ignored the ROD estimates, the government may not be responsible for plaintiff's difficulties. However, if the conversion factor was disproportionate as a result of the Corps' failure to adequately estimate the quantities regardless of plaintiff's requirement to do further testing, the government could be liable. Whether the government's decision to ignore the quantity estimates provided in the ROD was reasonable, however, is a question of fact which may not be decided on summary judgment. *Engle Investors v. United States,* 21 Cl.Ct. 543, 550 (1989).

Whether processing and transporting the soils was governed primarily by design or performance specifications is a third dispute that may affect the claim. Design specifications "describe in precise detail the materials to be employed and the manner in which the work is to be performed." *Blake Constr. Co. v. United States,* 987 F.2d 743, 745 (Fed.Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 438, 126 L.Ed.2d 372 (1993). The contractor is afforded no discretion in performing the contract. *Id.* Performance specifications, in contrast, "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance selecting the means and assuming a corresponding responsibility for that selection." *Id.* Plaintiff claims that the contract indicated the amount of soil to be processed and the type of dechlorination process required. Plaintiff insists that it questioned the RFP conversion factor of 1.105 tons/cubic yards as unrealistic, but that the government would not consider plaintiff's objection. (Pl.'s App.Ex. 34.) Plaintiff presents evidence that the RFP required the use of the new and uncertain "Galson" process. (Pl.'s App.Exs. 93, 94.) The government maintains that ThermoCor and SoilTech made the decision of which processing system to use and that the quantities in the contract were just estimates. (Def.'s App. at 426–27.) The issue of whether the contract was predominantly design or performance requires an inquiry into the Corps' and ThermoCor's conduct. Whichever party was responsible for choosing the process may provide insight into which party is responsible for the overruns and the contractor's difficulties. Insomuch as the court does not weigh the evidence, whether the figures were just estimates and whether the contract was one of design or performance represents genuine issues of material fact which cannot be disposed of on summary judgment. *See Information Sys.,* 34 Fed.Cl. at 459–60.

Finally, the most compelling dispute involves the true magnitude of the overruns. Although the parties do not dispute the final amount of quantities for payment, they do dispute the overrun amounts. Plaintiff asserts that it was required to treat 41,735 tons of material compared to the 21,000 tons estimated (Pl.'s App.Ex. 73), while defendant claims that the amount treated was only 33,360 tons (Def.'s App. at 645–46). The difference between these amounts comes from the parties' misunderstanding of whether the original estimates and the final counts were adjusted for moisture. Plaintiff cites *Saddler* for the proposition that substantial increases in quantities constitute a cardinal change. In *Saddler,* the contractor was required to provide the materials and labor necessary for the construction of a levee embankment using estimated quantities of embankment and backfill based on unit prices. A change order added over 1,000 feet to the total length of the levee. *Saddler,* 152 Ct.Cl. at 560. The court found that the added work, an increase of earthwork from 7,950 yards to 13,000, "albeit the same kind of work described in the original specifications" amounted to a cardinal change outside the scope of the contract because the variance was not within reasonable limits. *Id.* at 564. It held that "plaintiff cannot be said to have waived the impact of the extensive change." *Id.* at 563. Whether the quantity increases in the case at bar reached a point beyond reasonable limits, however, cannot be determined on the facts before the court.

Given the potential extent of the overruns, the court could find a cardinal change; however, it is precluded from entering summary judgment due to the contrary assertions about the magnitude of the overruns. The court has no choice but to hear evidence on the cardinal change theory limited to plaintiff's claim for an equitable adjustment for increased quantities under Bid Items 14 and 15. *See Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11.

## C. Changes Clause Theory

Plaintiff asserts that if it is not entitled to an equitable adjustment under the VEQ clause or under the cardinal change rule, it is entitled to one under the Changes clause. The contract required ThermoCor to excavate and treat soils within an excavation template described in the plans and specifications. Post-excavation testing, however, allegedly identified contaminated soils beyond the original limits of the template. Plaintiff contends that the Corps' directives to excavate and treat substantial quantities of soil beyond the template justifies an equitable adjustment to the contract price under the Changes clause, equal to the actual costs of performance. Defendant asserts that because there was no change in design, the Changes clause does not apply to the situation at hand. Furthermore, the parties argue as to whether the Changes clause circumvents the application of the VEQ clause.

The Changes clause gives the government the unilateral right to order changes in work within the scope of the contract. The clause also provides for an equitable adjustment if the change increases or decreases the cost or time of performance. Where the cost of performance greatly differs from the stated unit price due to changes ordered by the government, the Changes clause may override the VEQ clause. *Appeal of C.H. Leavell & Co.*, 75–2 BCA ¶ 11,596, ENG BCA No. 3492, 1975 WL 1589 (1975). To hold otherwise, plaintiff would be without legal remedy if it cannot prove the requirements of the VEQ clause yet is still forced to bear substantial changes in costs due to changes by the government. There is no indication that the VEQ clause

was to override the Changes clause nor that it was to be the exclusive means for obtaining a changes adjustment. Rather, by its terms, the VEQ clause supplements the Changes clause by providing limits to equitable adjustments for quantities absent ordered changes or extraordinary events. *See, e.g., Reliance Ins. Co. v. United States*, 931 F.2d 863, 865 (Fed.Cir.1991). Where circumstances alter "the entire contemplated basis for performance of the contract," the Changes clause should not be ignored pursuant to another clause such as the VEQ clause. *Morrison–Knudsen Co. v. United States*, 184 Ct.Cl. 661, 689, 397 F.2d 826 (1968) (holding that a contract provision denying the contractor any compensation for changes unless total costs of contract adjustments exceeded 25% of the contract price should be overridden by the Changes clause because the basis of the contract was altered). In the present case, because plaintiff may not be able to prove an equitable adjustment under the VEQ clause, its rights under the Changes clause should not be frustrated.

Where overruns result from the contracting officer's decision to expand the limits of the work, a contractor is entitled to an equitable adjustment under the Changes clause rather than the VEQ clause. The parties, however, dispute whether excavation beyond the template, not required by the contract, was ordered. (Pl.'s App.Ex. 47; Def.'s App. at 429A.) ThermoCor's president testified at a deposition that the Corps provided "a very close well-defined excavation template with what the excavation was." (Pl.'s App.Ex. 131.) The remedial project manager for EPA testified at a deposition that "it was indeed possible to go beyond or deeper than had been specified in the RFP." (Pl.'s App.Ex. 98.) He further testified that the amounts increased because the cubic yards of soil increased and the weight per cubic yard increased. (Pl.'s App.Ex. 91.) Defendant, however, provides evidence that the contract required further excavation then indicated by the template. (Def.'s App. at 199–200.) Summary judgment is not appropriate to try and reconcile these obvious factual determinations. *See Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. In any

event, the record is not clear as to whether modifications and orders to perform work on the excess quantities were made under the authority of the Changes clause, therefore the court cannot say whether the Changes clause applies. *Weaver–Bailey Contractors, Inc. v. United States,* 19 Cl.Ct. 474, 478 (1990). Thus, the parties must be given the opportunity to prove at trial whether excavation beyond the template was ordered pursuant to the Changes clause.

## IV. Bad Faith and Defective Specifications

Plaintiff argues that defendant lacked due care in preparing the contract estimates, citing (1) the magnitude of the variation between the estimates and the actual quantities of material processed and transported offsite and (2) declarations by the Crops' representatives that the estimates made in the contract were "crude." Defendant claims at the outset that plaintiff improperly raises a bad faith and defective specifications claim for the first time in its motion for partial summary judgment because it had not raised this claim in its request for equitable adjustment submitted to the contracting officer or in its complaint.

■ Plaintiff couched its request for relief to the contracting officer and in its complaint in terms of the VEQ clause. Plaintiff maintains its request pursuant to defective specifications now is only an alternative theory under which it has a right to an equitable adjustment for the increased quantities processed and transported offsite. A court has jurisdiction over a claim only if it is "based on the same set of operative facts underlying the claim" submitted to the contracting officer. *Cerberonics,* 13 Cl.Ct. at 417. Here, plaintiff's claim is based on issues requiring proof of defendant's intent in estimating the contract amounts and lack of due care in creating them. This involves entirely different facts from proving a requirement to perform extra work. Accordingly, the court lacks jurisdiction over plaintiff's claim based on bad faith and defective specifications because it had not been the subject of a final decision by the contracting officer nor raised in the complaint.

## CONCLUSION

For the reasons stated above, plaintiff's motion for partial summary judgment is denied and defendant's cross motion is granted in part and denied in part. The parties are to confer and report back to the court within thirty days from the date of this order with a proposed trial schedule.

**IT IS SO ORDERED.**