**Fenton GINGERICH and Eunice Gingerich, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 98–533 T.**

United States Court of Federal Claims.

Sept. 18, 2002.

Reissued on Oct. 9, 2002.

---

Teresa J. Womack, Houston, TX, for plaintiffs.

Ellen C. Specker, with whom were Assistant Attorney General Loretta C. Argrett, Mildred L. Seidman, William K. Drew, Washington, DC, for defendant.

**OPINION and ORDER**

TURNER, Senior Judge.

Plaintiffs, individual taxpayers who received partnership income and were assessed for income taxation thereon, seek refunds of federal income taxes paid pursuant to a tax settlement agreement arising from a partnership tax matter. The case stands on cross-motions for summary judgment, filed simultaneously on December 20, 1999, which essentially address the parties' differing positions concerning the proper date for commencement of the one-year period within which the Internal Revenue Service could have made a valid assessment of each plaintiff's individual tax liability. *See* 26 U.S.C. § 6229(f).

We conclude that a settlement agreement was reached for assessment purposes on September 22, 1993 when the relevant individual closing agreements (IRS Form 906) were finalized, and that the one-year assessment period ran from that date. Accordingly, we further conclude that the relevant assessments made in 1994 were not barred by the one-year statute of limitation and, consequently, that plaintiffs are not entitled to refunds. It follows that defendant's motion for summary judgment should be granted and that plaintiffs' motion for summary judgment must be denied.

**I**

The material facts are undisputed. Plaintiffs Fenton and Eunice Gingerich, Seung C. and Young Ho Karl, Choong H. and Joung S. Kim, Eugene M. Rosol, Charles H. Scruggs, and Dae–Sob and Moon K. Yoon were all direct partners in General Information Associates Partnership (GIA). Def. Proposed Findings of Uncontroverted Fact (PFUF), ¶ 1. Plaintiffs Carl V. and Nelle D. Liebovich, Albert and Dorothy Liebovich, Joe and Belle Liebovich, Gregory A. and Gail Liebovich, Larry J. and Barbara J. Liebovich, and Samuel D. and Erna S. Liebovich were all indirect partners in GIA by virtue of their status as shareholders of LouBess, Inc., an S corporation which was a direct partner in GIA. Def. PFUF, ¶ 2.

After an examination of GIA, the Internal Revenue Service mailed on April 9, 1990, a notice of final partnership administrative adjustment (FPAA) to the Tax Matters Partner (TMP) of GIA for tax years 1983 through 1986. DX 1, App. B at B–001.[1] On August 16, 1990, Raymond and Irma Ziff, partners other than the TMP and not plaintiffs in this case, filed a petition for readjustment (i.e., contesting the FPAA) in the United States Tax Court pursuant to 26 U.S.C. § 6226(b). DX 2, App. B at B–012 to B–013. All named plaintiffs in this action filed a notice of election on February 19, 1991, permitting them to participate in the Tax Court proceeding. DX 2, App. B at B–014 to B–015.

On January 23, 1991, Thomas E. Redding, counsel for plaintiffs, contacted IRS District Counsel William H. Stoddard to inquire about any settlement that may have been proposed by other partners of GIA. DX 3, App. B at B–019; PX 19 at 146 (letter from Redding to Stoddard, IRS, 1/23/91). Redding's letter contained a request for (a) a copy of any settlement agreement between the IRS and any other partner; (b) certain materials exchanged between the IRS and GIA; and (c) information regarding the person or entity who, on behalf of GIA, consented to an extension of the statute of limitations for assessment by the IRS. *Id.* The letter also expressed an interest in settling the case:

> Although I am interested in evaluating the concept of ... settlement ..., there are details that I would like to review with you. Specifically, I am extremely concerned that the final settlement documents comprehensively settle this case and include appropriate language to avoid recognition of "phantom" income in the future and potential forgiveness of indebtedness or gain relative to long term debt connected with the partnership relative to which the partners have not been accorded the losses in the early years.

DX 3, App. B at B–020; PX 19 at 147.

On behalf of the IRS District Counsel, Bruce Wilpon replied to Redding on January 31, 1991. DX 4, App. B at B–026; PX 18 at 142 (letter from Wilpon to Redding, 1/31/91). He proposed a settlement on the following terms:

> 1. For each partner's first year of investment in GIA, each partner could claim a loss of 60% of his verified out-of-pocket cash investment, less the amount of any partnership losses previously allowed. In addition, plaintiffs would be entitled to carry over the loss to immediately succeeding taxable years until exhausted, but could not include as a part of the investor's cash investment any interest paid on notes in favor of the partnership.
>
> 2. The government would concede the applicability of the additions to the tax pursuant to certain IRC provisions.
>
> 3. Investors were to concede the applicability of an increased rate of interest pursuant to IRC section 6621(c).
>
> 4. Plaintiffs could not claim any further losses, investment interest expense, or other deductions attributable to the partnership.

DX 4, App. B at B–026 to B–027; PX 18 at 142 to 143.

The IRS letter also stated that "if all of the participating partners agree to the settlement contained in this letter, [Redding] should send proof of [each partner's] verified cash investment and the disposition of any closed prior years." *Id.* Wilpon also expressed the intent to apply the settlement contained in the letter to those partners who agreed to its terms and then planned to file a motion for entry of decision with the Tax Court. *Id.*

On February 12, 1991, Redding replied to the government's offer to settle by explaining that settlement negotiations were premature. DX 5, App. B at B–030; PX 16 at 137 (letter from Redding to Wilpon, 2/12/91). In a critical response to the government's letter, Redding stated that "a response [to your settlement offer] is extremely inappropriate when you have failed to respond to my discovery requests," and further stated that he planned to file a motion for summary judgment in the

---

**1.** References designated "PX" and "DX" are to exhibits in the parties' respective appendices to

their motions for summary judgment filed on December 20, 1999.

Tax Court proceeding regarding the validity of the statute of limitations extension. *Id.*

On March 11, 1991, the government responded to Redding by writing that "[t]here may come a time when we feel that settlement negotiations are no longer productive. At that time, we will inform you in writing that the settlement offer will be withdrawn as of a date we decide." PX 14 at 134.

Redding replied to the government on July 5, 1991, expressing confusion about the terms of the government's proposed settlement. Redding suggested alternative settlement terms with a draft closing agreement. DX 6, App. B at B–033; PX 12 at 81 (letter from Redding to IRS, 7/5/91). Plaintiffs' counsel further reiterated to the government that he intended to file a motion for partial summary judgment regarding application of the statute of limitations to certain tax assessments. *Id.*

The government rejected plaintiffs' settlement offer by letter on October 17, 1991. DX 7, App. B at B–052; PX 11 at 78 (letter from IRS to Redding, 10/17/91). However, the government (IRS) stated that it would leave its original offer open as long as the government was not required to call any witnesses for the Tax Court's determination of plaintiffs' motion for partial summary judgment. *Id.*

The Tax Court denied plaintiffs' motion for partial summary judgment on September 29, 1992. *Gen. Info. Assoc. P'ship v. Commissioner,* 64 T.C.M. (CCH) 957, 1992 WL 238777 (1992). In light of this development, the government again wrote Redding on October 22, 1992: "Please inform us of your decision to accept or reject the settlement offer previously extended in this case on or before December 1, 1992." PX 10 at 76.

Redding responded to the government on November 13, 1992, enclosing a form acceptance letter for each partner to execute and requesting that district counsel review it to confirm that such a letter received "within the time specified would constitute a valid acceptance of the settlement." PX 9 at 73. Redding also suggested that "a Closing Agreement be used in order to resolve all issues that are not partnership items issues and therefore are not before the Court in [the Tax Court] proceeding." Plaintiffs' counsel also stated that a draft closing agreement would be forwarded and asked that government counsel advise "as quickly as possible whether or not this will be acceptable." *Id.*

On November 17, 1992, the government (IRS) responded by providing a revised closing agreement and granting plaintiffs extra time to respond to the settlement proposal. DX 8, App. B. at B–055 to B–057; PX 8 at 70–72 (letter from Wilpon to Redding, 11/17/92). The government response stated that "we agree with your outline of settlement terms set out in Draft Acceptance Form," and gave 30 days additional time to respond. *Id.* The government wrote an additional letter to plaintiffs' counsel on December 18, 1992 concerning the settlement offer, stating that "although it is our intention to continue to make the settlement available to all the investors, we can neither accept nor process any investor settlements (*e.g.,* closing agreements) or enter a decision in this case (setting forth the settlement) until a new [TMP] is chosen for the partnership." PX 4 at 61 (letter from Maselli to MacLean, 12/18/92).

On December 30, 1992, Redding mailed to the district counsel a separate letter on behalf of each partner enclosing an acceptance form executed by the partner and a copy of the draft closing agreement that had originally been enclosed with Redding's November 13, 1992 letter. PX 7 at 68. Redding wrote in the letter, "I would appreciate it if you would countersign the copy of each of the acceptance letters and return them to me as soon as possible." PX 7 at 68 (letter from Redding to Wilpon, 12/30/92).

On January 26, 1993, the government sent closing agreements for plaintiffs who had provided verified proof of cash investments in GIA. DX 9, App. B at B–058; PX 6 at 67 (letter from IRS to Redding, 1/26/93). That letter also stated that, "[i]t should be understood that this settlement is subject to review and acceptance on behalf of the respondent." *Id.*

On February 18, 1993, the IRS contacted Redding again and informed him that "*no settlement occurs until closing agreements*

*are signed by your clients and countersigned by the appropriate Service representative."* DX 10 at B–059; PX 5 at 66 (letter from IRS to Redding, 2/18/93) (emphasis in original). The IRS representative Wilpon also indicated that he intended to file a motion with the Tax Court to enter a decision reflecting the "full disallowance of all losses claimed by GIA on its partnership returns." *Id.*

On March 17, 1993, Redding notified the IRS that he found two provisions of the closing agreement to be inconsistent with the terms of settlement set out in prior communications. DX 11, App. B at B–060; PX 3 at 57. Redding also wrote: "It was my understanding from your prior correspondence that proceeding with closing agreements was essentially on hold until a new tax matters partner was appointed for the partnership." *Id.* Redding also responded to the government's February 18, 1993 letter and stated that a settlement had already been entered, writing:

> [Y]ou state that "no settlement occurs until closing agreements are signed by my clients and countersigned by the appropriate service representative." If this is an attempt to repudiate the settlement that you offered and my clients accepted, I must disagree. I will in good faith make every effort to cooperate with you in implementing closing agreements which, as I indicated many times, I believe are essential to carry out the agreement entered into by my clients.

DX 11 at B–060; PX 3 at 58.

On June 7, 1993, plaintiffs' counsel contacted the government again. In this letter, Redding recanted his position that the closing agreements were inconsistent with the terms of the settlement agreement. DX 12 at B064; PX 161 at 2695. In that letter, he refers to the closing draft as "the discussion draft I had sent you for the basis of settlement acceptance form." *Id.* In its brief, the government notes that the final closing agreements contained two new matters, first ¶ 10 provided that "[t]he FPAA was issued timely to the tax matters partner of the Partnership for the taxable year 1983," and, more importantly, ¶ 3 provided that the partner has an "adjusted basis of zero as of December 31, 1983 for his/her interest in the Partnership." Def. Br. (12/20/99) at 20.

The Tax Court issued an order on September 7, 1993 requiring petitioners (plaintiffs in the present case) to select a new TMP. DX 23 at B–165 to B–166. The court noted that all "nonsettling partners" will be affected by the outcome of the case. *Id.* at B–166. In addition, the court defined "nonsettling partners" as "partners who have not executed a closing agreement reflecting the project settlement or, if they have executed the closing agreement, the agreement has not yet been countersigned by an authorized representative of the respondent." *Id.*

On September 10, 1993, plaintiffs' counsel returned the closing agreements as signed by plaintiffs. DX 13 at B–065 to B–119; PX 2 at 2–56. In returning the letters to the IRS, plaintiffs' counsel noted, "Please have the closing agreements countersigned and a copy of each sent to my office as soon as possible. Clearly, once they are countersigned and a copy returned to me, the settlement will become enforceable as to the years not before the court and the relevant affected items." DX 13 at B–065; PX 2 at 2. An authorized representative of the IRS signed these closing agreements on September 22, 1993. DX 14–19 at B–120 to B–145. Copies of the fully-executed closing agreements were mailed to Redding on September 24, 1993. DX 20 at B–146; PX 1 at 1 (Wilpon to Redding letter, 9/24/93).

On December 27, 1993, Redding filed a motion to dismiss the matter pending before the Tax Court. DX 26 at B–174 to B–175. On January 11, 1994, the court directed plaintiffs to submit copies of the executed settlement agreements. DX 27 at B–177 to B–178. Plaintiffs submitted copies of both the December 30, 1992 acceptance letters and the subsequent closing agreements. DX 28, at B–179. The government responded to plaintiffs' motion on February 17, 1994 with a "Notice of No Objection" stating that "no settlement was reached with any of the movants until the closing agreements were signed by the movants and countersigned by an appropriate representative for the respondent." DX 29 at B–183 to B–184.

On February 23, 1994, the Tax Court dismissed the case against plaintiffs for lack of jurisdiction. DX 30 at B–189 to B–190. Two days later, the court dismissed the case with respect to the remaining partners for lack of prosecution. DX 31 at B–191 to B–195. Subsequently, on March 25, 1994, the government/respondent requested that the court set forth the date when each movant ceased to be a party to the proceeding. DX 32 at B–196 to B–204. The Tax Court, however, declined to supplement its order and did not state a date as of which the court no longer had jurisdiction over each plaintiff, stating only that as of the time of the 1994 order, it did not have jurisdiction over plaintiffs, because the plaintiffs had entered into settlement agreements by then (or prior to that date). DX 33 at B–209 to B–210.

The government subsequently filed assessments against the plaintiffs individually within a year from the date (September 22, 1993) that the closing agreements were signed by the IRS. Plaintiffs assert that their December 30, 1992 letter constitutes their acceptance of the government's offer of settlement and began the one-year period within which the IRS was required to make any resulting assessments.[2] Plaintiffs contend that the assessments were made after the one-year statutory limitation period and now seek a refund of the moneys paid. Lacking a genuine issue of material fact, this case is ripe for disposition upon summary judgment.

## II

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the parties have filed cross-motions for summary judgment, the court must evaluate each motion on its own merits. *See Thermocor, Inc. v. United States*, 35 Fed.Cl. 480, 485 (1996). In deciding whether summary judgment is appropriate, it is not the court's function "to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see also United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Liberty Lobby*, 477 U.S. at 247–48, 106 S.Ct. 2505.

Here, taking all of plaintiffs' factual assertions as true, as well as all reasonable inferences from those facts in their favor, we find that the parties' tax settlement agreement was entered into on September 22, 1993. Because the individual assessments were made within one year of the dates on which partnership items of the partners converted to non-partnership items, plaintiffs are not entitled to a tax refund. Accordingly, summary judgment in favor of the United States is appropriate.

## III

In enacting the Tax Equity and Fiscal Responsibility Act, Pub.L. No. 97–284, 96 Stat. 324, Congress decided "that the tax treatment of certain partnership items—such as income, loss, deductions, and credits—would be determined at the partnership level in a unified way rather than in a separate proceeding by the partners." *Brookes v. United States*, 20 Cl.Ct. 733, 736 (1990) (citing H.R. Conf. Rep. No. 97–260, 97th Cong., 2d Sess. 600 (1982) and I.R.C. § 6221). Under this Act, the IRS may adjust the treatment of partnership items if it files a notice of Final Partnership Administrative Adjustment (FPAA). The FPAA is analogous to the notice of deficiency used to determine individual or corporate tax deficiencies. I.R.C. § 6212; *Clovis v. Commissioner*, 88 T.C. 980, 1987 WL 49309 (1987). The part-

---

2. Plaintiff Rosol's closing agreement was countersigned by the IRS on March 16, 1993. Pl. Br. (12/20/99) at 16. The government assessed the tax contemplated in that closing agreement on

January 3, 1994, Compl. at 66, plainly within one year of complete execution of the closing agreement.

nership's Tax Matters Partner (TMP) may then petition the Tax Court for a readjustment. *See* I.R.C. § 6226(a). If the Tax Matter Partner fails to file a petition within the statutory period, other partners may file a petition for readjustment. *See* I.R.C. § 6226(b).

The Act provides a narrow definition of partnership tax items. I.R.C. § 6231(a)(3). Most items, including settlements, are considered to be non-partnership items. *See* I.R.C. § 6231(b)(1)(C); *Monge v. United States,* 27 Fed.Cl. 720, 722 (1993). The distinction is important because the IRC's statute of repose differentiates periods of making assessments. Specifically,

> If before the expiration of the period otherwise provided in this section for assessing any tax imposed by subtitle A with respect to the partnership items of a partner for the partnership taxable year, such items become nonpartnership items by reason of 1 or more of the events described in subsection (b) of section 6231, the period for assessing any tax imposed by subtitle A which is attributable to such items (or any item affected by such items) shall not expire before the date which is 1 year after the date on which the items become nonpartnership items.

I.R.C. § 6229(f).

The parties disagree on whether the income tax assessments, made by the IRS in 1993, were timely, given the one-year limitations period set out in 26 U.S.C. § 6229(f). Both sides acknowledge that, under that statute, it is only a valid settlement agreement which commences the limitations period. They disagree, however, about when, on the facts of this case, such an enforceable agreement was reached. Plaintiffs argue that the December 30, 1992 letter to the IRS was the binding settlement which triggered the limitations period. In contrast, the IRS contends that the letter was not a contract and that only the countersigned September 1993 closing agreements are binding on the parties. Clearly, a finding on whether the December 1992 letter was intended to complete a binding agreement controls the resolution of this matter.

## IV

Settlement agreements in tax cases are governed by general principles of contract law. *See Treaty Pines Inv. P'ship v. Commissioner,* 967 F.2d 206 (5th Cir.1992). A tax settlement agreement may be binding even if it consists of only letters of offer and acceptance; no formal stipulation of settlement, filed decisional document, or closing agreement is necessary. *Id.* at 211. Plaintiffs would have us look, however, merely to the fact of correspondence, not the substance of that correspondence, to divine some manifestation of mutual assent.

To create a binding agreement, a purported acceptance must mirror the terms of the offer. 1 Arthur Linton Corbin, Corbin on Contracts, § 3.28 (1993); Restatement (Second) of Contracts § 58 (1981). "A communicated offer creates a power to accept the offer that is made and only that offer. Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer; but it is not an acceptance and consummates no contract." *Buesing v. United States,* 47 Fed.Cl. 621, 633 (2000); 1 Arthur Linton Corbin, Corbin on Contracts § 3.28 (1993) (footnote omitted). A purported acceptance must be accurate in every material respect, as "a variation in the substance of the offered terms is material, even though the variation is slight." *Id.* at § 3.32.

Settlement negotiations in this case began in January 1991 when defendant presented an offer of settlement to plaintiffs' counsel, Redding. This offer was rejected by plaintiffs, who then presented a counter-offer of settlement. When defendant rejected this counter-offer in October 1992, negotiations apparently broke down and did not resume until over one year later. During the interim, defendant left its original offer open; however, instead of manifesting assent to this offer, on November 13, 1992, plaintiffs again presented to the government their own offer of settlement—in the form of draft acceptance letters—and their own version of a closing agreement, having reached a consensus with the government that a closing

agreement would be used to complete the settlement process.

The government's response, by letter dated November 17, 1992, was not a manifestation of assent to the plaintiffs' offer, but rather acted as a counter-offer, as the letter included a draft Form 906 closing agreement that differed materially from the plaintiffs' November 13, 1992 version of the closing agreement. Significantly, the December 30, 1992 letters claimed by plaintiffs to constitute acceptance of the government's offer did not mirror the terms of the government's November 17, 1992 counter-offer. Plaintiffs submitted executed acceptance letters, but sent copies of their November 13, 1992 version of the closing agreement which had been superseded by the government's November 17, 1992 closing agreement. Because plaintiffs' December 30, 1992 correspondence did not mirror the terms of the government's November 17, 1992 offer, it did not constitute an acceptance of that offer. From this sequence of events, we conclude that on December 30, 1992, the parties had not mutually assented to the material terms of a settlement agreement, and thus, no contract was created on that date.

Our conclusion that no settlement agreement was created on December 30, 1992, but rather when the Form 906 closing agreements were executed by both parties, is also supported by a careful comparison of the facts here to those in *Treaty Pines*, 967 F.2d 206 (5th Cir.1992). First, the court in *Treaty Pines* had before it the taxpayer's letter purporting to accept the Commissioner's settlement offer and an IRS letter purporting to confirm that the taxpayer had "accepted the original settlement offer." *Id.* at 209, 211. Here, plaintiffs contend their December 30, 1992 letter accepted the government's offer, but there is no corresponding letter from the IRS confirming the plaintiffs' acceptance. Second, in *Treaty Pines*, the court found a binding settlement agreement between the IRS and the taxpayer in letters of offer and acceptance the parties exchanged on the basis that nothing in the letter contemplated the execution of further, formal documents. *Id.* at 211 (citing *Haiduk v. Commissioner*,

60 T.C.M. (CCH) 864, 1990 WL 136717 (1990)).

Here, the parties clearly contemplated the need to execute a closing agreement to finalize the settlement. It was plaintiffs who initiated discussions regarding the use of a closing agreement in the case and submitted the first draft closing agreement exchanged between the parties. PX 9 at 73. Furthermore, on December 18, 1992, before the date of plaintiffs' purported acceptance, the government reiterated to plaintiffs' counsel that closing agreements were a condition precedent to settlement and that IRS approval was required to finalize settlement. PX 4 at 61 (letter from Maselli to MacLean, 12/18/92). Finally, the parties in *Treaty Pines* never executed a closing agreement, whereas here, the parties ultimately executed the Form 906 closing agreements on September 22, 1993. While we agree with the Fifth Circuit's conclusion on the facts of *Treaty Pines*, the situation addressed there differs substantially from this case.

Because no settlement agreement was concluded on December 30, 1992, and because the relevant settlement was not final until September 22, 1993, when a representative from the IRS signed the closing agreements, we conclude that the 1994 tax assessments are not time-barred under the applicable period of limitation. *See* 26 U.S.C. § 6229(f), and thus plaintiffs are not entitled to a tax refund.

## V

Based on the foregoing, defendant's motion filed on December 20, 1999 for summary judgment is GRANTED, and plaintiffs' motion for summary judgment, also filed on December 20, 1999, is DENIED. Accordingly, judgment shall be entered in favor of defendant. Pursuant to RCFC 54(d), costs shall be allowed to defendant ("the prevailing party").